## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS
## EASTERN DIVISION

| | |
|---|---|
| **L.M.,** a minor by and through his father and stepmother, Christopher and Susan Morrison, | |
| *Plaintiff,* | **CASE NO.: 23-cv-11111-IT** |
| v. | **REQUEST FOR ORAL ARGUMENT** |
| **TOWN OF MIDDLEBOROUGH; MIDDLEBOROUGH SCHOOL COMMITTEE**; **CAROLYN J. LYONS**, Superintendent of the Middleborough Public Schools, in her official capacity; and **HEATHER TUCKER**, acting Principal of Nichols Middle School, in her official capacity, | L.R., D. Mass.7.1(d) |
| *Defendants.* | |

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .......................................................................III

INTRODUCTION ................................................................................. 1

FACTUAL BACKGROUND ..................................................................... 2

ARGUMENT ....................................................................................... 5

I.      L.M. IS LIKELY TO SUCCEED ON THE MERITS. ................................... 6

    A.      Defendants are violating L.M.'s right to free speech by discriminating against his viewpoint. ................................................................ 6

        1.      L.M.'s shirts are constitutionally protected speech. ............................ 7

        2.      Defendants' Speech Policy discriminates on the basis of viewpoint. ..... 8

        3.      Defendants cannot justify their discriminatory treatment of L.M.'s views. ...................................................................... 9

    B.      Defendants are violating L.M.'s right to due process of law by authorizing officials to censor whatever they "determine[] to be unacceptable." ................................................................... 13

II.     ALL OTHER PRELIMINARY INJUNCTION FACTORS FAVOR L.M. .. 14

    A.      L.M. is suffering irreparable injury. .......................................... 14

    B.      The balance of equities favors L.M.. ......................................... 15

    C.      Entering L.M.'s requested injunction serves the public interest .............. 15

CONCLUSION .................................................................................. 16

CERTIFICATE OF SERVICE ................................................................ 18

# TABLE OF AUTHORITIES

## Cases

*A.M. ex rel. Norris v. Cape Elizabeth School District,*
   422 F. Supp. 3d 353 (D. Me. 2019) ........................................................................... 15

*Bethel School District No. 403 v. Fraser,*
   478 U.S. 675 (1986) ........................................................................................ 7, 9

*Bowler v. Town of Hudson,*
   No. CV 05-11007-PBS, 2007 WL 9797643 (D. Mass. Dec. 18, 2007) ........................ 9

*Connally v. General  Construction Co.,*
   269 U.S. 385 (1926) ........................................................................................... 13

*Dorce v. Wolf,*
   506 F. Supp. 3d 142 (D. Mass. 2020) ......................................................................... 15

*Elrod v. Burns,*
   427 U.S. 347 (1976) ........................................................................................... 15

*Grayned v. City of Rockford,*
   408 U.S. 104 (1972) ........................................................................................... 14

*Holloman ex rel. Holloman v. Harland,*
   370 F. 3d 1252 (11th Cir. 2004) ............................................................................... 11

*K.D. ex rel Dibble v. Fillmore Central School District,*
   No. 05-CV-0336(E) 205 WL 2175033 (W.D.N.Y. Sep. 6, 2005) .............................. 10

*Mahanoy Area School District v. B.L.ex rel. Levy,*
   141 S Ct. 2038 (2021) ................................................................................... passim

*McCullen v. Coakley,*
   573 U.S. 464 (2014) ........................................................................................... 12

*Morse v. Frederick,*
   551 U.S. 393 (2007) ............................................................................................. 9

*Norris ex rel. A.M. v. Cape Elizabeth School District,*
   969 F.3d 12 (1st Cir. 2020) .......................................................................... 6, 10, 12

*Pyle ex rel. Pyle v. South Hadley School Committee,*
   861 F. Supp. 157 (D. Mass. 1994) ....................................................................... 8, 10

*Pyle ex rel. Pyle v. South Hadley School Committee,*
  55 F.3d 20 (1st Cir. 1995) ............................................................... 8

*R.A.V. v. City of St. Paul,*
  505 U.S. 377 (1992) ......................................................................... 8

*Reed v. Town of Gilbert,*
  576 U.S. 155 (2015) ................................................................ 8, 9, 13

*Rosenberger v. Rectors & Visiors of University of Virginia,*
  515 U.S. 819 (1995) ..................................................................... 6, 8

*Shelton v. Tucker,*
  364 U.S. 479 .................................................................................... 1

*Sindicato Puertorriqueno v. Fortuno,*
  699 F.3d 1 (1st Cir. 2012) ......................................................... 6, 15

*Stephenson v. Davenport Community School District,*
  110 F.3d 1303 (8th Cir. 1997) ...................................................... 13

*Tinker v. Des Moines Independent Community School District,*
  393 U.S. 503 (1969) ............................................................... passim

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,*
  455 U.S. 489 (1992) ....................................................................... 13

*West Virginia Board of Education v. Barnette,*
  319 U.S. 624 (1943) ......................................................................... 1

*Zamecnik v. Indian Prairie School District,*
  636 F.3d 874 (7th Cir. 2011) ........................................................ 11

## INTRODUCTION

The Constitution forbids the state from using the public schools as a tool "to coerce uniformity of sentiment in support of some end thought essential" by the government. *W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 640 (1943). "The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools," because their role is to promote "effective exercise of the rights which are safeguarded by the Bill of Rights" *Shelton v. Tucker*, 364 U.S. 479, 487 (1960) (cleaned up). "America's public schools are the nurseries of democracy," *Mahanoy Area Sch. Dist. v. B.L.ex rel. Levy*, 141 S Ct. 2038, 2046 (2021), and thus cannot be allowed to become "enclaves of totalitarianism." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 511 (1969).

Defendants have abandoned this function and placed these crucial freedoms in jeopardy by adopting a Speech Policy that openly discriminates on the basis of viewpoint. What's more, Defendants themselves have "prescribe[d] what shall be orthodox" on a hotly contested matter of public concern—gender identity—and filled the school with their own expression of that orthodoxy and encouraged individual students to add their own voices to the chorus, so long as their views harmonize with the Defendants'. *Barnette*, 319 U.S. at 642. When Plaintiff L.M. sought to respond with a different tune, Defendants punished him. When he spoke up again in protest of their censorship, Defendants punished him for that.

Defendants claim they can silence L.M. because they think his view is controversial. "But freedom to differ is not limited to things that do not matter much. That would be a mere shadow of freedom. The test of its substance is the right to differ as to things that touch the heart of the existing order." *Id.* To vindicate L.M.'s rights and prevent Defendants from prevailing in purging his message from the school, L.M. respectfully requests a temporary restraining order and preliminary injunction on an emergency basis end expedited briefing schedule.

## FACTUAL BACKGROUND

L.M. is a twelve-year old, 7th-grader at Nichols Middle School ("NMS"). Complaint, Doc. No. 11 at 9 (¶ 55). NMS is not cloistered from cultural debates or political controversies. Indeed, school officials and other students routinely express their views about a wide range of subjects, from religion, to immigration, to sports. *See id*. at 11–12 (¶¶ 79–81). Students, as permitted by school policy, express messages with their clothing. *Id*. at 11 (¶¶ 78–79). Defendants express messages with flags, posters, events, and more. *See id*. at 9–12 (¶¶ 62–66; 80–82).

One especially controversial subject on which Defendants express their views is the relationship of human identity, sex, and gender. *Id*. at 9 (¶¶ 58–62). Defendants display what is known as the "Progress Pride Flag," over the door of a classroom. *See id*. at 11–12 (¶¶ 80–1). They display posters, including one that says "RISE UP TO PROTECT TRANS AND GNC STUDENTS." *Id*. They host an annual "Pride Month," which they define as "the promotion of the self-affirmation, dignity, equality, and increased visibility of LGBTQIA+ people as a social group." *Id*. at 9–10 (¶ ¶ 63–4). Through these and other means, Defendants embrace, endorse, and express the idea that what makes a person male or female is solely that person's identity and has no relation to that person's biology. *Id*. at 9 (¶ 59). Defendants further express the idea that, however a person identifies, that identity is "valid" and must be recognized as such by others. *Id*. (¶ 60). And, since the range of human identity is unlimited, Defendants express the view that there are an unlimited number of "valid" genders. *Id*. (¶ 61). Defendants not only express these views themselves, they encourage students to express their own views on this subject through their apparel—as long as they agree with Defendants' views. *See id*. at 9–10 (¶¶ 65–66).

L.M. wishes to speak on the same subject, but to offer a perspective that differs from the view that dominates the discussion, thanks in large part to

Defendants' endorsement. *See id.* at 10  (¶¶ 69–73). L.M. understands that there are two sexes and that a person's gender (status as male or female) is rooted in that reality. And that Defendants' message demanding validation of unlimited genders with no relation to human biology is both false and harmful. *See id.* at 10 (¶¶ 67, 72). In addition, L.M. detects that many of his classmates also dissent from Defendants' view but are afraid to voice their disagreement because of the pressure that Defendants create through their endorsement. *Id.* (¶ 71). L.M. does not want to see anyone silenced; he seeks only to express his own view and to show his fellow classmates that caring, compassionate people can hold diverse views, in good faith, on the important subject of gender. *Id.* (¶¶ 72–3).

On March 21, 2023, L.M. tried to express his message about gender in the same way that Defendants encourage other students to speak on the same issue: he wore a t-shirt. *See id.* (¶ 66) (describing Defendants' materials encouraging students to "[w]ear your Pride gear to celebrate Pride Month"); *Id.* at 11 (¶ 76). L.M.'s shirt silently, respectfully, and truthfully conveyed his view. It said, "There are only two genders." *Id.* (¶ 77).

Defendants quickly censored L.M.'s speech. During gym, his first class of the day, Defendant Tucker removed L.M. from class and told him that he could not wear the shirt. *Id.* at 13 (¶ 83). There had been no disruption of gym class, and no student conveyed any objection or displayed any consternation to L.M. about the shirt. *Id.* (¶¶ 92–94). But Defendant Tucker told L.M. he could not wear the shirt because other students had complained and that he would have to remove it. *Id.* at (¶¶ 83–84). When L.M. politely explained that he could not in good conscience remove the shirt, Defendant Tucker called L.M.'s father, who came and picked L.M. up from school. *Id.* (¶¶ 88–91).

On April 1, L.M.'s father contacted Defendant Lyons seeking an explanation for Defendants' actions. *Id.* at 14 (¶ 95). He explained that L.M. just wanted "to

express his own political statement" on "a topic that is being discussed in social media, schools, and churches all across our country" in the same way that "he sees others doing" each day at school. *Id.* Defendant Lyons responded, confirming that she supported Defendant Tucker's actions and attributing them to enforcement of the school's dress code (the "Speech Policy"). *Id.* (¶ 96).

The Speech Policy permits students to wear clothing with messages in general. *See* Complaint Exhibit C, Doc. No. 11-5 at 46. But it provides, "[c]lothing must not state, imply, or depict hate speech or imagery that target groups based on race, ethnicity, gender, sexual orientation, gender identity, religious affiliation, or any other classification." *Id.* It further states, "[a]ny other apparel that the administration determines to be unacceptable to our community standards will not be allowed." *Id.*

Applying the Speech Policy, Defendant Lyons claimed that L.M.'s shirt "targeted students of a protected class; namely in the area of gender identity." Doc. No. 11 at 14  (¶ 96). Defendant Lyons added, "While I cannot share the numbers or names of students and staff that complained about this shirt, I can assure you that there were several students and staff who did." *Id.* Defendant Lyons did not explain how expressing the view that there are only two genders "targeted" any students and she did not claim that L.M.'s expression disrupted any school activities. *Id.*

On April 27, L.M.'s attorney sent a letter to Defendant Lyons notifying her that Defendants were violating the First Amendment and that L.M. intended to wear his shirt again on Friday, May 5. *Id.* at 15 (¶¶ 98–99). Defendants' counsel responded on May 4, stating that Defendants' Speech Policy "has, and will continue to, prohibit the wearing of a t-shirt by L.M. or anyone else which is likely to be considered discriminatory, harassing, and/or bullying to others . . . ." *Id.* (¶ 100). The letter explained that Defendants interpret their Speech Policy to prohibit all

speech that expresses the view that any "gender identity or expression does not exist or is invalid." *Id.*

After receiving the letter, L.M. decided to express a different message. Instead of his preferred message about gender, L.M. decided to communicate his opposition to the fact that Defendants were censoring some views about gender while allowing the expression of their preferred views about gender. Thus, on May 5, L.M. wore a shirt that said, "There are censored genders." *Id.* at 16 (¶ 104).

Even though this shirt also did not "target[]" any students or even express a view about gender at all, L.M. was sent to the office as soon as he arrived for his first class. *Id.* (¶ 105). L.M. took his shirt off and Defendant Tucker instructed him not to put it back on for the rest of the day. *Id.* (¶ 106–07). Again, L.M.'s shirt did not cause a disruption of any kind. *Id.* at 16–17 (¶ 110–11).

Defendants continue enforcing their Speech Policy to prohibit L.M. from expressing his view about gender (while permitting other students to express their views) and to stop L.M. from expressing his opposition to the censorship of certain views about gender. *Id.* at 17 (¶ 114). L.M. wants to communicate his view by wearing his "There are only two genders" shirt, but is refraining from doing so out of fear that he will be punished again. *Id.* at 18 (¶ 118). L.M. is suffering ongoing harm from the loss of his constitutional rights and from losing the opportunity to speak his message. If Defendants' censorship of L.M. is not corrected before the end of this school year on June 21, L.M.'s objectives in speaking will be frustrated in a way that cannot ever be fully corrected. *See id.* at 17 (¶¶ 116–17).

## ARGUMENT

L.M. needs a preliminary injunction to stop Defendants from continuing to violate his constitutional rights. "When assessing a request for a preliminary injunction, a district court must consider (1) the movant's likelihood of success on the merits; (2) the likelihood of the movant suffering irreparable harm; (3) the

balance of equities; and (4) whether granting the injunction is in the public interest." *Norris ex rel. A.M. v. Cape Elizabeth Sch. Dist.*, 969 F.3d 12, 22 (1st Cir. 2020). All four factors favor L.M., so the Court should grant his request for preliminary injunctive relief.

## I.   L.M. is likely to succeed on the merits.

L.M. is likely to succeed on the merits of his claims. Because his claims allege a violation of his First Amendment rights, the likelihood of success is the most important factor. Indeed, "[i]n the First Amendment context, the likelihood of success on the merits is the linchpin of the preliminary injunction analysis," because constitutional deprivations cause irreparable injury, the government has no interest in imposing them, and the public interest is served by remedying them. *Sindicato Puertorriqueno v. Fortuno*, 699 F.3d 1, 10 (1st Cir. 2012). Since Defendants' own interpretation and enforcement of their Speech Policy show that they are censoring L.M. on the basis of viewpoint, he is likely to succeed on his constitutional claims.

### A.   Defendants are violating L.M.'s right to free speech by discriminating against his viewpoint.

L.M.'s personal expression of his views about gender and censorship through his "There are only two genders" and "There are censored genders" shirts is core First Amendment speech. Defendants singled out one particular viewpoint on the topic of gender for restriction while expressing other views themselves and encouraging students to express similar views, even through the same medium as L.M.—clothing. This "discriminate[s] against an entire class of viewpoints" and is therefore subject to strict scrutiny (if not unconstitutional *per se*). *Rosenberger v. Rectors & Visiors of Univ. of Va.*, 515 U.S. 819, 831 (1995). Defendants cannot meet that high standard.

### 1. L.M.'s shirts are constitutionally protected speech.

Students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker*, 393 U.S. at 506. This is because American public schools prepare students to be citizens. Schools must promote the free exchange of ideas, not "foster a homogeneous people." *Id.* at 511. To serve this purpose, schools must have "tolerance of divergent political and religious views, even when the views expressed may be unpopular." *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 681 (1986).

Schools may limit students' private expression, but only if the speech causes "material and substantial interference with schoolwork or discipline." *Tinker*, 393 U.S. at 511. Schools are not permitted to simply assume that some viewpoints will necessarily be disruptive and categorically prohibit their expression in advance. Rather, the Supreme Court has explained that "the discomfort and unpleasantness that *always* accompany an unpopular viewpoint" is expressly *not* a sufficient basis for limiting expression. *Id.* at 509 (emphasis added). And the Court has recently explained why this is so: "the school *itself* has an interest in protecting a student's *unpopular* expression," because of schools' role in preparing citizens fit to carry on "[o]ur representative democracy." *Mahanoy*, 141 S. Ct. at 2046 (emphasis added). If there is to be any presumption, it is that the school must *protect* speech it deems unpopular, rather than presuming that unpopular speech will lead to material disruption. *Id.*

Just as schools cannot ban some viewpoints on the assumption that their expression will cause disruption, so too they cannot operate on the assumption that the mere expression of certain viewpoints amounts to harassment. As this Court held, "The First Amendment does not permit official repression or homogenization of ideas, even odious ideas, and even when the expression of these ideas may result in hurt feelings or a sense of being harassed." *Pyle ex rel. Pyle v. S. Hadley Sch.*

*Comm.*, 861 F. Supp. 157, 159 (D. Mass. 1994), *vacated in part on other grounds*, 55 F.3d 20 (1st Cir. 1995). "A school committee may not ban speech other than that reflecting the dominant or most comforting ethos." *Id.*

Nondisruptive speech, regardless of its viewpoint, is protected, and L.M.'s speech on his shirts caused no disruption. Doc. No. 11 at 13, 16-17 (¶¶ 92–94, 110–11). Defendants never identified any disruption and instead expressly referenced "[t]he content of L.M.'s shirt" and the viewpoint that it expressed "in the area of gender identity" as the basis for their action. *Id.* at 14 (¶ 96). L.M.'s speech is constitutionally protected speech.

### 2. Defendants' Speech Policy discriminates on the basis of viewpoint.

Defendants' Speech Policy discriminates on the basis of viewpoint by prohibiting some viewpoints about gender but not others and by targeting L.M. because he expressed opposition to Defendants' censorship of only specific views about gender. The government "has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (striking ordinance that discriminated against signs that were "ideological," "political," or pertained to a religious event). Laws "that target speech based on its communicative content . . . are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Id.* at 163–64. "When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant. Viewpoint discrimination is thus an egregious form of content discrimination." *Rosenberger*, 515 U.S. at 829. This egregious governmental action is *per se* unconstitutional, even in public schools. *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 393–94 (1992) (it is a "certainty" that viewpoint discrimination is impermissible, even when regulating speech that is

8

otherwise "categorically excluded from the protection of the First Amendment");
*Bowler v. Town of Hudson*, No. CV 05-11007-PBS, 2007 WL 9797643, at *3 (D.
Mass. Dec. 18, 2007) (holding that the "prohibition of viewpoint discrimination" in
K-12 schools is "clearly established").

Defendants *admit* that their Speech Policy discriminates on the basis of
viewpoint. They say that the District "has, and will continue to, prohibit" expression
of the view that any "gender identity or expression does not exist or is invalid." Doc.
No. 11 at 15. (¶ 100). But the District *permits* and even *encourages* students to
communicate the view that any gender identity or expression *does* exist or is *valid*.
*See id.* at 9, 11-12 (¶¶ 60–61, 66, 80–82). This naked viewpoint discrimination is *per
se* unconstitutional under the longstanding principles of *Rosenberger* and *R.A.V.*
and applied to the K-12 context by this Court in *Bowler*. 2007 WL 9797643, at *3.

### 3. Defendants cannot justify their discriminatory treatment of L.M.'s views.

Defendants' Speech Policy also fails strict scrutiny, under which a speech
regulation is unconstitutional unless it "furthers a compelling interest and is
narrowly tailored to achieve that interest." *Reed*, 576 U.S. at 171. Defendant Lyons
admitted that the school acted based on "[t]he content of L.M.'s shirt," so at the very
least it must satisfy this stringent standard. Doc. No. 11 at 14 (¶ 96). Defendants
cannot meet it.

A school's only legitimate interest in regulating private student speech is in
avoiding "material and substantial interference with schoolwork or discipline."[1]
*Tinker*, 393 U.S. at 511. L.M.'s shirts did not cause any disruption, let alone a
"material and substantial" one. *Id. See also* Doc. No. 11 at 13, 16–17 (¶¶ 92–94,
110–11). The burden is on the Defendants to make a "showing" that "engaging in

---

[1] Schools may have other interests in regulating private student speech when it meets the specific
exceptions outlined in *Bethel*, 478 U.S. at 684–85 (lewdness) or *Morse v. Frederick*, 551 U.S. 393, 409–10 (2007)
(promoting illegal drug use), but there can be no serious suggestion that "There are only two genders" or "There are
censored genders" implicates either of those categories.

the" conduct "forbidden" by their Speech Policy will cause the disruption. *Tinker*, 393 U.S. at 509.

The fact that some students allegedly complained about the shirts does not amount to a disruption. For example, in *Tinker*, the Court acknowledged that the students' protest of the Vietnam War—an extremely controversial subject at the time—"caused discussion outside of the classrooms, but no interference with work and no disorder." *Id.* at 514. Absent a showing of such interference or disorder, "our Constitution does not permit officials of the State to deny their form of expression." *Id.*

Indeed, the First Circuit has said that causing "*argument* on a controversial topic" is still not sufficient grounds "to punish a student because [of] her speech." *Norris*, 969 F.3d at 32 (emphasis added). And, when the speech complained of is silently expressed through apparel, the absence of disruption is all the more obvious, since the students who find the speech offensive have a simple solution: look away. "Certainly students do not have the right not to be 'upset' when confronted with a viewpoint with which they disagree" on a t-shirt when they can just look somewhere else. *K.D. ex rel Dibble v. Fillmore Cent. Sch. Dist.*, No. 05-CV-0336(E) 205 WL 2175033 (W.D.N.Y. Sep. 6, 2005) (finding no material disruption from t-shirt that said "abortion is homicide").

The complaints from "staff" referenced by Defendant Lyons, Doc. No. 11 at 14 (¶ 96), also cannot qualify as a material disruption under *Tinker*, because staff members are state actors. If a state actor's objection to speech was a sufficient basis for restricting it, then viewpoint discrimination would be self-justifying. That cannot be, since the unpopularity of speech is the main reason it requires (and receives) protection. *Mahanoy*, 141 S Ct at 2046; *Pyle*, 861 F. Supp. at 159.

Here, L.M. observed no students complain or become upset and there were no classroom disturbances. Defendants cannot meet their burden to make a "showing"

of material and substantial disruption sufficient to justify silencing L.M. *Tinker*,
393 U.S. at 509.

Defendants also cannot rely on "undifferentiated fear or apprehension of
disturbance" that they assign to the expression of views they believe are unpopular.
*Id.* at 508. Such a rule would permit the majority's sensibilities to set the boundary
of protected speech, a rule which "turns reason on its head" in a First Amendment
context. *Holloman ex rel. Holloman v. Harland*, 370 F. 3d 1252, 1275 (11th Cir.
2004). Allowing such a rule "is to sacrifice freedom upon the alter [sic] of order, and
allow the scope of our liberty to be dictated by the inclinations of the unlawful mob."
*Id.* Protection for speech, even in schools, "must include the protection of unpopular
ideas, for popular ideas have less need for protection." *Mahanoy*, 141 S. Ct. at 2046.

The unworkability of the "heckler's veto" version of disruption is especially
evident in a case like this, where Defendants are engaged in and encourage
expression on a variety of politically-charged topics. Doc. No. 11 at 11–12 (¶¶ 79–
81). Why shouldn't L.M. or the other students that agree with L.M. be permitted to
veto the expression of other students that Defendants encourage in connection with
"Pride Month"? After all, this expression conveys the message that deeply-held
views of L.M. and other students that agree with him are "invalid"—either there *are*
"only two genders" or there aren't. The only rule protecting *anyone* is the one that
protects *everyone* by rejecting the heckler's veto. "Otherwise free speech could be
stifled by the speaker's opponents' mounting a riot, even though, because the speech
had contained no fighting words, no reasonable person would have been moved to a
riotous response." *Zamecnik v. Indian Prairie Sch. Dist.*, 636 F.3d 874, 879(7th Cir.
2011).

Defendants are perhaps on their weakest ground (which is saying something)
when they punished L.M. for his "There are censored genders" shirt, which (1)
expresses a message about censorship, not about gender or any other classification

governed by the Speech Policy, and (2) is a message directed to school officials, not other students. Students have a constitutional interest in engaging in nondisruptive protest of school actions.

For example, in *Norris*, the First Circuit upheld a preliminary injunction against punishment of a student who posted a note that said, "THERE'S A RAPIST IN OUR SCHOOL AND YOU KNOW WHO IT IS" in part because the "YOU" in the note could be read as "a statement speaking out against the . . . administration's perceived inadequate handling of sexual assault claims." 969 F.3d at 14, 33. The court found the speech was protected, even though it also implied that another student (who other students could identify from context) was a rapist. *Id.* at 20.

L.M.'s speech protesting Defendants' censorship of specific viewpoints about gender, on the other hand, does not identify or refer to any student at all. L.M. is merely protesting the school's restriction of his speech. "In our system, state-operated schools may not be enclaves of totalitarianism." *Tinker*, 393 U.S. at 511. The fact that Defendants punished L.M. specifically for his protest about censorship shows that they are treading this prohibited path.

In addition to having no interest in punishing any of L.M.'s speech, Defendants' Speech Policy fails the narrow-tailoring requirement of strict scrutiny. Narrow-tailoring requires that the Speech Policy "must be the least restrictive means" of achieving the government's asserted interest. *McCullen v. Coakley*, 573 U.S. 464, 478 (2014). The Speech Policy simultaneously permits officials to restrict an enormous amount of speech—anything "the administration determines to be unacceptable to our community"—even while school officials engage in and promote speech on a wide array of topics, many of which may be offensive to some students. *See* Doc. No. 11 at 11–12 (¶¶ 79–81).

On top of this, the school itself continues to promulgate materials that convey the very message for which they punished L.M. The Student Handbook states, "All

aspects of public school education must be fully open and available to members of *both* sexes" and defines "Sexual Harassment" to include "written materials or pictures derogatory to *either* gender." *See id.* at 10 (¶ 68). Defendants cannot claim that censoring L.M.'s shirt saying "There are only two genders" is a narrowly tailored means to achieve a compelling interest when their own materials continue to affirm a gender and sex binary. *See Reed*, 576 U.S. at 172 (a policy is not narrowly tailored to some compelling interest "when it leaves appreciable damage to that supposedly vital interest unprohibited").

Because L.M.'s speech is core protected speech and Defendants punished him because of his viewpoint without identifying any material disruption, L.M. is likely to succeed in showing that their Speech Policy is violating his First Amendment rights.

### B. Defendants are violating L.M.'s right to due process of law by authorizing officials to censor whatever they "determine[] to be unacceptable."

Under the Due Process Clause, a regulation is unconstitutionally vague if it "forbids or requires the doing of an act in terms so vague that [students] of common intelligence must necessarily guess at its meaning and differ as to its application." *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926). This doctrine "prevents arbitrary and discriminatory enforcement," *Stephenson v. Davenport Cmty. Sch. Dist.*, 110 F.3d 1303, 1308 (8th Cir. 1997), and applies with additional force where policies "interfere[] with the right of free speech." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1992).

The Speech Policy fails in two respects. First, it fails to give students adequate notice of when it applies. It says that "Clothing must not state, *imply* or depict hate speech or imagery that targets groups based on race, ethnicity, gender, sexual orientation, gender identity, religious affiliation, or *any other classification*." Doc. No. 11 at 8 (¶ 49) (emphasis added). Students are constitutionally guaranteed

"a reasonable opportunity to know what is prohibited." *Grayned v. City of Rockford*, 408 U.S.104, 108 (1972). The Speech Policy breaches that guarantee, subjecting students to punishment and censorship if their clothes somehow *imply* (through "hate speech," whatever that is, or "imagery") a message that "targets" a laundry list of groups, left completely open-ended to include "any other classification." Doc. No. 11 at 8 (¶ 49). No student can read the Speech Policy and know what is prohibited, and this makes it unconstitutional.

Second, the Speech Policy lacks "explicit standards for those who apply [it]." *Grayned*, 408 U.S. at 108–09. The same provisions described above alone demonstrate the lack of standards. But just in case there was any doubt, the Policy also expressly gives enforcers unlimited discretion under the policy, barring "[a]ny other apparel that the administration determines to be unacceptable to our community standards." Doc. No. 11 at 8 (¶ 50). And Defendants' actions show that this is no surplusage: they use this exact leeway to silence speech.

L.M.'s second shirt, which said "There are censored genders," does not, by any stretch of the imagination, implicate any of the substantive prohibitions in the Speech Policy. The shirt is addressed to school officials, and comments on *censorship*, not on gender or "any other classification." *Id.* (¶ 49). But Defendants punished him anyway. That's because the Speech Policy vests them with unlimited discretion to restrict speech, and this dooms their Policy under both the First and Fourteenth Amendments.

## II. All other preliminary injunction factors favor L.M.

L.M. is substantially likely to prevail on his claims. Since all other factors also favor L.M., the Court should grant his requested preliminary injunction.

### A. L.M. is suffering irreparable injury.

Defendants are depriving L.M. of his constitutional right to speak. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably

constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Indeed, where a plaintiff establishes a likelihood of success on a First Amendment claim, "[t]here is no need for an extensive analysis of this element of the preliminary injunction inquiry." *Sindicato*, 669 F.3d at 15. Because L.M. has "made a strong showing of likelihood of success on the merits of their First Amendment claim, it follows that the irreparable injury component of the preliminary injunction analysis is satisfied as well." *Id.*

### B. The balance of equities favors L.M.

The balance of equities also favors L.M. L.M. is suffering irreparable injury, *supra* Part II.A, while the school has not identified any interest that justifies censoring either his speech about gender or his speech protesting the censorship of speech about gender. *Supra* Part I.A.3. In the public school context where "Defendants' punishment chills [a student] from engaging in otherwise constitutionally-protected speech," the "equities weigh in favor of issuing preliminary injunctive relief," since the school can always impose a punishment later if the school ultimately succeeds on the merits. *A.M. ex rel. Norris v. Cape Elizabeth Sch. Dist.*, 422 F. Supp. 3d 353, 368 (D. Me. 2019), *aff'd on other grounds sub nom.*, 969 F.3d 12 (1st Cir. 2020). L.M. is losing the opportunity to express his message and respond to Defendants' censorship, so the balance of equities favors him.

### C. Entering L.M.'s requested injunction serves the public interest.

Enjoining Defendants' unconstitutional acts serves the public interest because "it is 'always in the public interest to prevent the violation of a party's constitutional rights.'" *Dorce v. Wolf*, 506 F. Supp. 3d 142, 145 (D. Mass. 2020) (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)). "America's public schools are the nurseries of democracy. Our representative democracy only works if we protect the 'marketplace of ideas.'" *Mahanoy*, 141 S. Ct. at 2046. Defendants are

not only censoring speech about gender—a matter of enormous public concern—they're suppressing speech that is protesting their act of censorship. *Supra* Part I.A.1. Defendants' acts pose a grave threat to individual rights and to the ability of schools to serve their function, both of which are vital public interests. An injunction is urgently needed to preserve those interests.

## CONCLUSION

This Court should enjoin Defendants' ongoing violation of L.M.'s constitutional rights.

Respectfully submitted this 19th day of May, 2023.

*s/ Andrew Beckwith*
Andrew Beckwith
MA Bar No. 657747
MASSACHUSETTS FAMILY INSTITUTE
401 Edgewater Place, Suite 580
Wakefield, MA 01880
Telephone:  (781) 569-0400
andrew@mafamily.org

David A. Cortman*
GA Bar No. 188810
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd. NE
Suite D-1100
Lawrenceville, GA 30043
Telephone: (770) 339-0774
Facsimile: (700) 339-6744
dcortman@ADFlegal.org

Tyson C. Langhofer*
VA Bar No. 95204
P. Logan Spena*
VA Bar No. 98407
Alliance Defending Freedom
44180 Riverside Parkway
Lansdowne, Virginia 20176
Telephone: (571) 707-4655
tlanghofer@ADFlegal.org
lspena@ADFlegal.org

*Attorneys for Plaintiff*
*\*Pro Hac Vice application forthcoming.*

## CERTIFICATE OF SERVICE

I hereby certify that on May 19, 2023, I electronically filed the foregoing using the CM/ECF system, and will serve the same via email with Plaintiff's Verified Complaint on Counsel for the following parties:

Gregg Corbo
KP Law
101 Arch St,
Boston, MA 02110
gcorbo@k-plaw.com

*Counsel for*
**Town Of Middleborough**

Kay H. Hodge, Esquire
Stoneman, Chandler & Miller LLP
99 High Street
Boston, MA 02110
(617) 542-6789 (work)
(617) 686-8858 (cell)
(617) 340-8587 (fax)
khodge@scmllp.com

*Counsel for*
**Middleborough School Committee**
**Carolyn J. Lyons**
**Heather Tucker**

Dated: May 19, 2023                    s/*Andrew Beckwith*
                                       _____
                                       Andrew Beckwith

                                       *Attorney for Plaintiff*