UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

**Civil Action No. 1:23-cv-11111-IT**

| | |
|---|---|
| ███████, a minor by and through his father and stepmother and natural guardians, Christopher and Susan Morrison,<br><br>    Plaintiff<br><br>v.<br><br>TOWN OF MIDDLEBOROUGH; MIDDLEBOROUGH SCHOOL COMMITTEE; CAROYLN J. LYONS, Superintendent of the Middleborough Public Schools, in her capacity; and HEATHER TUCKER, acting Principal of Nicholas Middle School, in her official capacity,<br><br>    Defendants | MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER[1] |

## I.    INTRODUCTION

Defendants, Town of Middleborough, Middleborough School Committee, Carolyn J. Lyons, Superintendent of the Middleborough Public Schools in her official capacity, and Heather Tucker, Interim Principal of John T. Nicholas Middle School in her official capacity (collectively "Defendants"), hereby oppose Plaintiff ███████, a minor by and through his father and stepmother and natural guardians, Christopher and Susan Morrison's ("Plaintiff" or "███") Emergency Motion for a Temporary Restraining Order ("Emergency Motion" or "TRO").

Plaintiff a student at the John T. Nicholas Middle School ("NMS"), filed his "Emergency" Motion, almost two (2) months after he wore a t-shirt to school that had emblazoned on it the

---

[1] Plaintiff simultaneously filed a motion for a temporary restraining order and a motion for preliminary injunction. Pursuant to the Court's May 25, 2023 order, this memorandum addresses only Plaintiff's motion for a temporary restraining order. Defendants reserve the right to supplement their memorandum and accompanying affidavits when filing their opposition to Plaintiff's request for preliminary injunction. Defendants intend to add affidavits and additional legal analysis in support of Defendants' opposition at the preliminary injunction stage.

1

message, "there are only two genders," a message that is inherently exclusionary and harassing to members of the LGBTQ+ community at NMS and which in essence tells transgender and gender nonconforming students that their gender identity, a protected status in the Commonwealth of Massachusetts, does not exist. Nowhere in Plaintiff's Complaint or Motion for a TRO does Plaintiff even acknowledge that gender identity is a protected status in Massachusetts. NMS has a Dress Code, which Plaintiff incorrectly and repeatedly refers to in his Complaint as the "Speech Policy," which prohibits students from wearing any clothing that depicts imagery "that targets groups based on race, ethnicity, gender, sexual orientation, gender identity, religious affiliation or any other classification." Pursuant to the NMS Dress Code, Plaintiff was told to remove the shirt and a version of the same t-shirt that he subsequently wore to school (hereinafter the two t-shirts will be referred to collectively as the "t-shirt").

In his Complaint, Plaintiff alleges that the NMS Dress Code and Defendants directive to Plaintiff that he remove the t-shirt, violated his First Amendment rights and his right to Due Process under the Fourteenth Amendment of the United States Constitution. Plaintiff now seeks a TRO pursuant to Rule 65(b) of the Federal Rules of Civil Procedure seeking to enjoin Defendants from enforcing the Dress Code and seeking an order from this Court that he be allowed to wear the subject t-shirt in school. Plaintiff's Motion for TRO must be denied not only because Plaintiff is not likely to prevail on the merits of his claims, but because there is a significant public interest in avoiding the hardship that students who identify as members of the LGBTQ+ community at NMS will suffer if the TRO is granted and this public interest far outweighs any hardship to Plaintiff in not being allowed to wear the t-shirt until a more detailed hearing can be conducted on June 13, 2023.

Defendants have the responsibility by law to provide a safe and inclusive environment for all students. Massachusetts law protects against discrimination, harassment and bullying based on

gender identity. See, G.L. c. 71, § 5 and G.L. c. 71, § 37O. The laws and guidance issued by the Department of Elementary and Secondary Education ("DESE") recognize that certain students may be more vulnerable to becoming targets of bullying or harassment based on actual or perceived differentiating characteristics, including gender identity or expression. By prohibiting Plaintiff from wearing the t-shirt, Defendants were properly upholding Massachusetts law and protecting the rights of all students to learn in a safe non-harassing, and inclusive environment. The protection of transgender and gender non-conforming students at NMS is not, as Plaintiff suggests in his Complaint merely a matter of "popular culture," but is a protected status by law. Plaintiff's message was inherently exclusionary, was in clear and direct violation of the Dress Code and went against the laws and policy of the Commonwealth seeking to protect transgender and gender non-conforming students from discrimination, harassment and bullying and consequently is not protected speech under the First Amendment in the school setting.

Therefore, for the reasons set forth below, the Plaintiff's request for a TRO should be denied.

**II.     FACTUAL SUMMARY**

Defendant Carolyn Lyons is the Superintendent of the Middleborough Public Schools ("MPS"). The Superintendent has been employed with the Middleborough Public Schools since July 2012, first holding the position of Secondary Special Education Facilitator, then as the Director of Pupil Personnel Services. Exhibit 1 – Superintendent's Affidavit, ¶ 1. Heather Tucker is the Interim Principal of NMS. Ms. Tucker started her job as Interim Principal of NMS on March 20, 2023. Exhibit 2 – Principal's Affidavit, ¶ 1. The NMS Student and Family Handbook ("Handbook") is provided each year to students and their families. Each student signs a form agreeing to abide by the policies contained in the NMS Handbook. The Handbook contains a Dress Code for all students who attend NMS that provides in part that clothing worn by students "must

not state, imply, or depict hate speech or imagery that target groups based on race, ethnicity, gender, sexual orientation, gender identity, religious affiliation or any other classification." Exhibit 1, ¶ 2. Plaintiff and his father signed the form agreeing to abide by the policies contained in the NMS Handbook on September 1, 2022. Exhibit 2, ¶¶ 2 and 3.

Plaintiff is a student at NMS. Complaint, ¶ 6. On March 21, 2023, Plaintiff wore a t-shirt to NMS with the message, "there are only two genders." Principal Tucker was notified by the Assistant Principal, Jason Carroll, that Plaintiff was wearing a t-shirt with the message, "there are only two genders." Plaintiff's teacher reported the t-shirt and was concerned for Plaintiff's physical safety as well as other students' safety, citing to multiple members of the LGBTQ+ population at NMS as current students in the building who would be impacted by the t-shirt message and potentially disrupt classes. Exhibit 2, ¶ 4. The Principal went to speak to the Plaintiff at the start of his physical education class. She introduced herself to Plaintiff and asked him to come speak to her. Plaintiff asked the Principal if he was in trouble, to which she responded no. Plaintiff asked the Principal if it was about his t-shirt to which the Principal responded, yes. The Principal offered Plaintiff the opportunity to change the shirt and return to PE before they left the gymnasium, but Plaintiff did not want to do so. Exhibit 2, ¶ 5. The Principal met with Plaintiff with a School Counselor and asked him to remove the t-shirt before returning to class. Plaintiff declined to do so. Despite several efforts to convince the Plaintiff to change his shirt, he continued in his refusal to change. Exhibit 2, ¶ 6. The Principal contacted Plaintiff's father and asked that he have his son remove the t-shirt. He refused to comply with the Principal's request. Plaintiff's father then came to school and dismissed Plaintiff from school that day indicating that he preferred this course of action over removal of Plaintiff's t-shirt. Exhibit 2, ¶ 7. Plaintiff was not the subject of any discipline for having worn the t-shirt to school. Exhibit 2, ¶ 8.

When Plaintiff's father reached out to the Superintendent about the incident, the Superintendent supported the Principal's enforcement of the Dress Code and referred Plaintiff's father to language in the Dress Code advising him that the content of Plaintiff's shirt targeted students of a protected class, namely in the area of gender identity. Exhibit 1 ¶ 4. On April 13, 2023, there were two individuals outside of NMS, but not on school property, holding signs that read, "there are only two genders" and "keep woke politics out [of] our schools." Exhibit 1, ¶ 5; Exhibit 2, ¶¶ 12 and 13. The Superintendent received complaints from the LGBTQ+ community members. Exhibit 1, ¶ 6. Both the Superintendent and Plaintiff spoke at the School Committee meeting that night. Exhibit 1, ¶ 7. On April 14, 2023, counter protests were held outside of NMS with signs that read, "trans people belong" and "we support trans rights" and "everyone is welcome here" among other messages. Exhibit 1, ¶ 8; Exhibit 2, ¶ 14. The Superintendent received complaints from community members about those messages as well. Exhibit 1, ¶ 9. Defendants received an ongoing stream of hateful messages, tweets, emails and phone calls some threatening between April 24 and April 28, 2023. As a result the Middleborough Police Department provided additional support to NMS. Exhibit 1, ¶¶ 9-11. Since the March 21, 2023 incident involving the t-shirt, Plaintiff has expressed his views on transgender rights on local and national news media outlets, radio broadcasts, and social media. Exhibit 1, ¶ 12. Plaintiff was permitted to express his political views through clothing while at school with messages including "Don't Tread on Me" and "First Amendment Rights." Plaintiff was not asked to remove this clothing. Exhibit 2, ¶¶ 10 and 11.

On April 27, 2023, the Superintendent received correspondence from an attorney purporting to represent Plaintiff claiming that he was intending to wear a shirt bearing the phrase "There Are Only Two Genders" to school on May 5, 2023. Prior to May 5, 2023, the Superintendent met with Principal Tucker and the School's Counsel concerning the letter from

5

Plaintiff's attorney. Given the amount of media attention the subject had garnered, there were concerns that other students would also attempt to wear clothing with the same or similar messages.  Exhibit 1, ¶¶ 12-14.  The Superintendent was at NMS for the start of the school day on May 5, 2023. Plaintiff arrived at NMS and was observed by the Principal wearing a t-shirt with the message "there are only censored genders," covering the word "two" with the word "censored."  Exhibit 1, ¶ 15.   To avoid disruption and having to remove Plaintiff from class, Plaintiff was brought to the Administrative Office shortly after he arrived at school, where Plaintiff was left alone for a short period of time, while the Superintendent and Principal Tucker conferred with School Counsel.  It was decided to not allow him to wear the shirt during school that day. Although the meeting lasted only for a few minutes when Principal Tucker returned to the office Plaintiff had already taken off the t-shirt.  Plaintiff was not disciplined for wearing the t-shirt to school on May 5, 2023 and was allowed to proceed with his school day in the normal course.  Exhibit 1, ¶¶ 15-19; Exhibit 2, ¶¶ 19-21.

On or about Tuesday, May 9, 2023, two additional students appeared at school with t-shirts bearing the slogan "There Are Only Two Genders." Both students were required to meet with the Principal and were required to change their shirts. The Principal explained to each the reasons for her decision. One student complied and was allowed to return to class. The other refused to remove the shirt and the student's parents were called. The Principal met with the student's mother, in person, at the school. Following this meeting, the student went home as the school day was over. Neither student was disciplined as a result of wearing the shirt.  Exhibit 2, ¶ 23.

To further the goal of providing support to students who are part of the LGBTQ+ community, the NMS has a Gay Straight Alliance (GSA) club that has existed since at least 2018. The GSA has over 20 members and typically meets on a monthly basis. The GSA is a

"student-run organization that unites LGBTQ+ and allied youth to build community and organize around issues impacting them in their schools and communities." Exhibit 1, ¶ 21; Exhibit 2, ¶ 24. Student survey data collected in June 2022, through NMS's platform Panorama, show over 20 individual student's comments about perceived bullying at school, feeling unwelcome at school, and expressing specific concerns about how the LGBTQ+ population is treated at school. Exhibit 1, ¶ 22. To further the goal of providing support to students who are part of the LGBTQ+ community, in January 2022 NMS trained teachers and staff on the NMS Safe Schools Program for LGBTQ Students and revised its Gender Support Plan to support students while they are at NMS. The World of Difference student group from Middleborough High School, trained by the Anti-Defamation League (ADL), provided anti-bias training to all teachers and staff on May 27, 2022. Most recently, the ADL provided anti-bias professional development to all teachers and staff on January 13, 2023. Exhibit 1, ¶ 23.

The Superintendent and Principal Tucker are aware of several NMS students who have attempted to commit suicide or have had suicidal ideations in the past few years, including members of the LGBTQ+ community. These situations have frequently cited LGBTQ+ status and treatment as a major factor. In July 2022, one MHS student committed suicide. Exhibit 1, ¶ 24; Exhibit 2, ¶ 25.

### III.   LEGAL ARGUMENT

#### A.   TRO Standard

To determine whether to issue a TRO, the Court applies the same four-factor analysis used to evaluate a motion for preliminary injunction. See, We the People PAC v. Bellows, 512 F.Supp.3d 74 (2021). Those four factors are: (1) the likelihood of the movant's success on the merits; (2) the potential for irreparable harm to the movant if the injunction is denied; (3) a balancing of the relevant impositions, *i.e.,* the hardship to the nonmovant if enjoined as contrasted

with the hardship to the movant if no injunction issues; and (4) the effect on the public interest of a grant or denial of the injunction. Id., citing Esso Standard Oil Co. v. Monroig-Zayas, 445 F.3d 13, 17-18 (1st Cir. 2006). "A temporary restraining order 'is a provisional remedy imposed to maintain the status quo until a full review of the facts and legal arguments is available.'" Ginzburg v. Martínez-Dávila, 368 F.Supp.3d 343, 347 (D.P.R 2019) (quoting, Pro-Choice Network v. Schenck, 67 F.3d 377, 389-99 (2d Cir. 1995)). "Temporary restraining orders 'must be used sparingly and only in cases where the need for extraordinary relief is clear and plain.'" We the People PAC, 512 F.Supp.3d at 87 (quoting Nw. Bypass Grp. v. U.S. Army Corps. Of Eng'rs, 453 F.Supp. 2d 333, 338 (D.N.H. 2006)).

Here, there is no need for such extraordinary relief for several reasons. First, Plaintiff's claim for relief disturbs rather than preserves the status quo, essentially nullifying the Dress Code and opening the door for any student to wear whatever they want. Second, while Plaintiff filed his motion for TRO as an "Emergency" Motion, no such emergency exists. Plaintiff waited almost two (2) months to file his Motion knowing full well that Defendants' position regarding the t-shirt would not change, and frankly could not change for Defendants to comply with the laws in Massachusetts established to protect students based on their gender identities. Plaintiff's delay in requesting injunctive relief "sharply undercut[s]" his claim of emergency. See, Charlesbank Equity Fund II v. Blinds To Go, Inc., 370 F.3d 151, 163 (1st Cir. 2004) (delay not attributable to intervening events, detracts from the movant's claim of emergency). Finally, and most significantly, as will be set forth in more detail below, Plaintiff who bears the burden of establishing that the four factors weigh in his favor, will not be able to do so.

  B.  <u>Plaintiff is Not Likely to Prevail on the Merits of His Claims.</u>

Plaintiff cannot meet his burden of establishing that he is likely to succeed on the merits of his claims for the violation of his First Amendment and Due Process rights brought pursuant to 42

8

U.S.C., § 1983.  Plaintiff's message was not protected speech under the First Amendment while in school, but regardless Plaintiff did not suffer an adverse action as a result of wearing his t-shirt to school.

      1. <u>Plaintiff's Speech Is Not Protected By the First Amendment</u>

To prevail on his First Amendment claim under 42 U.S.C. § 1983, Plaintiff bears the burden of showing that (1) he was engaged in constitutionally protected conduct, (2) he was subjected to adverse actions by the School, and (3) the protected conduct was a substantial or motivating factor in the adverse actions. <u>Doe</u> v. <u>Hopkinton</u>, 19 F.4th 493 (1st Cir. 2021); citing, <u>D.B. ex rel. Elizabeth B.</u> v. <u>Esposito</u>, 675 F.3d 26, 43 (1st Cir. 2012).   Putting aside for the moment whether Plaintiff engaged in constitutionally protected conduct by wearing the t-shirt, Plaintiff will not be able to prevail on his First Amendment claim because Plaintiff was not subjected to an adverse action by Defendants because he wore the t-shirt.  Plaintiff in fact, was not disciplined in any way.  Instead, Plaintiff's father chose to remove his child from school for the day on March 21, 2023.  Since that time, Plaintiff has had ample opportunities to express himself other than by wearing the t-shirt at issue.  He has spoken publicly at a school committee meeting, he has been interviewed by news organizations and he is able to post his views on social media.  The Plaintiff has been permitted to wear other shirts in school bearing political messages without incident.  Because Plaintiff was not subjected to an adverse action, Plaintiff will not be able to show that his purported protected conduct was a substantial or motivating factor in the adverse action.  Simply put, because Plaintiff will not be able to establish the second and third prong of his First Amendment claim, he cannot succeed on the merits of his claim, and as a result his request for a TRO should be denied.

Assuming for purposes of argument only, that the mere fact that Plaintiff was required to remove his t-shirt amounted to an adverse action, Plaintiff still will not succeed on the merits of his First Amendment claim because his speech was not protected while at NMS. "The Supreme

Court has long held that schools have a special interest in regulating speech that 'materially disrupts classwork or involves substantial disorder or invasion of the rights of others.'" Doe v. Hopkinton Public Schools, 19 F.4th 493 (2021) (quoting Tinker v. U.S., 393 U.S. 503 (1969)), "'Courts generally defer to school administrators' decisions regarding student speech so long as their judgment is reasonable.'" Id., at 505 (quoting Norris ex rel. A.M. v. Cape Elizabeth Sch. Dist., 969 F.3d 12, 30 (1st Cir. 2020)). "School administrators must be permitted to exercise discretion in determining when certain speech crosses the line from merely offensive to more severe or pervasive bullying or harassment". Norris, at 29, n. 18.  Here, Defendants' decision that Plaintiff's message would cause not only disruption in school, but would invade the rights of others, the rights of students who are members of the LGTBQ+ community (a protected class) to feel safe in school and to be free from harassment and bullying while in school, was reasonable.

The Commonwealth of Massachusetts recognizes gender identity as a personal characteristic deserving of protection from discrimination, which inherently includes harassment. On July 1, 2012, An Act Relative to Gender Identity (Chapter 199 of the Acts of 2011) became effective in Massachusetts and amended several Massachusetts statutes prohibiting discrimination on the basis of specified categories to include discrimination on the basis of gender identity. Among the statues amended was G.L. c. 76, § 5 that prohibits discrimination on the basis of gender identity against students who enroll in or attend public schools. "The regulations implementing the anti-discrimination statute applicable to schools state that '[a]ll public school systems shall, through their curricula, encourage respect for the human and civil rights of all individuals regardless of gender identity.'" Foote v. Town of Ludlow, 2022 WL 18356421 (Civil Action No. 22030041-MGM, Slip Copy (2022)) (quoting, 603 C.M. R. § 26.05).[2]   In June 2012, the

---

[2] While the District Court case does not have precedential value because it was not published in the Federal Supplement, it is worth noting that the Court ((Mastroianni, J.) recognized the DESE guidance.

Massachusetts Board of Elementary and Secondary Education when adopting the regulations to reflect the broadened student anti-discrimination provision of G.L. c. 76, § 5, directed DESE to provide guidance to school districts to assist in implementing the gender identity provision recognizing that all students need a safe and supportive environment to progress academically and developmentally. The guidance helped school district administrators take steps to create a culture in which transgender and gender nonconforming students feel safe, supported and fully included, and to meet each school's obligation to provide equal educational opportunities to all students. The Massachusetts school bullying statute, G.L. c. 71, § 37O, recognizes that certain students are more vulnerable to becoming targets of bullying or harassment based on actual or perceived differentiating characteristics, including gender identity or expression and prohibits bullying on school grounds and at school sponsored and related activities, requiring schools to develop anti-bullying plans that recognize the vulnerability of certain students.[3]

Against the backdrop of the State statutes, regulations and DESE guidance, Defendants reasonably determined that the message on Plaintiff's t-shirt that attempted to extinguish the gender identity of transgender and gender non-conforming students did not create a culture in which transgender and gender nonconforming students would feel safe, fully supported and fully included at school. "Public school students who may be injured by verbal assaults on the basis of core identifying characteristics such as race, religion, or sexual orientation have a right to be free from such attacks while on school campuses. . . . Being secure involves not only freedom from physical assaults but from psychological attacks that cause young people to question their self-worth and their rightful place in society." Harper v. Poway Unified School District, 445 F.3d 1166, 1178 (9th Cir. 2006), cert. granted and vacated as moot, 549 U.S. 1262, 127 S.Ct. 1484, 167

---

[3] The U.S. Department of Education has also confirmed that Title IX protects students from discrimination based on sexual orientation and gender identity.

Case 1:23-cv-11111-IT   Document 35   Filed 05/31/23   Page 12 of 17

L.Ed. 2d 225 (2007). Because Plaintiff's t-shirt so clearly interferes with the rights of other students, he has no likelihood of success on the merits.

Plaintiff is also unlikely to succeed on this First Amendment claim because school officials reasonably determined that allowing him to wear the t-shirt would cause a substantial disruption in the learning environment. The anticipated and inevitable disruption that would follow if Plaintiff continued to wear the t-shirt in school denying the existence of a protected class of students and the rights of transgender and gender non-conforming students to attend school free of discrimination, fear, harassment, and bullying is evident. School officials acted reasonably in determining that it was necessary to make the plaintiff change his shirt to prevent such disruption and they were not required to "wait until the horse has left the barn before closing the door." Barr v. Lafon, 538 F.3d 554, 568 (6th Cir. 2008) (quoting, Lowery v. Euverard, 497 F.3d 584, 591-2 (6th Cir. 2007)). Therefore, Plaintiff's speech in the school setting denying the gender identity of a class of students that the law protects, is not protected speech under the First Amendment.

Finally, because Plaintiff's speech was not protected by the First Amendment, Plaintiff does not have Article III standing to challenge the language contained in the Dress Code. See, Doe, at 510, citing, Osediacz v. City of Cranston, 414 F.3d 136, 140-41 (1st Cir. 2005). Even if Plaintiff had standing to challenge the language of the Dress Code, his overbreadth argument fails because the Dress Code by prohibiting clothing that implies or depicts imagery or hate speech that target groups based among other protected categories, sexual orientation or gender identity, comport with the laws and regulations that protects students from discrimination, harassment and bullying. Plaintiff's message suggesting that their gender identity was invalid clearly was harassing in nature and directed at transgender and gender non-conforming students. Plaintiff's attempt to compare his message with those allowed within NMS misses the mark as the messages contained in his Complaint are all messages of inclusion seeking to support students and members

12

of the NMS community who are members of protected classes, as opposed to Plaintiff's message that sought to exclude and to deny the identity of transgender and gender non-conforming students.

Accordingly, because Plaintiff does not have a likelihood of success on the merits of his First Amendment claim his Motion for a TRO seeking to enjoin Defendants from enforcing the Dress Code and allowing him to wear the t-shirt should be denied.

2. Plaintiff Does Not Have a Likelihood of Success on his Due Process Claim.

In Count two of his Complaint Plaintiff alleges that the Dress Code both facially and as applied violates the Due Process Clause of the Fourteenth Amendment. Complaint, ¶¶ 154-159. Plaintiff does not articulate the basis for his due process claim and what process he claims he is or was due. Plaintiff omits from his Complaint, that if he or others had been disciplined for violating the Dress Code, the Student Handbook provides disciplinary guidelines and procedures. The fact is Plaintiff was not disciplined and was not denied any type of due process that may have been owed to him had he been.

Accordingly, because Plaintiff does not have a likelihood of success on the merits of his Due Process Claim.

C.   Plaintiff Will Not Suffer Irreparable Harm if the TRO Is Not Granted

Assuming arguendo that Plaintiff is able to meet his burden of showing a likelihood of success on the merits of his claims, Plaintiff will not be able to show that he will suffer irreparable harm if a TRO is not granted. See, e.g. Utah Gospel Mission v. Salt Lake City Corp., 316 F.Supp.2d 1201 (D.Utah 2004) (plaintiff's delay in initiating suit for two months combined with the existence of alternatives channels for communication negated presumption of irreparable harm in First Amendment context). In this matter, Plaintiff waited almost two months after the incident to file his Motion for a TRO. Plaintiff knew full well that Defendants were not going to change their position and allow him to wear a t-shirt that essentially maligned the gender identity of a

protected and vulnerable group of students. Moreover, Plaintiff has had ample alternative means for expressing his views, including speaking at public school committee meetings, giving interviews to news outlets, protesting outside of school grounds and posting on social media. The Plaintiff will not suffer irreparable harm by not being allowed to wear the t-shirt in school while the Court determines the merits of Plaintiff's underlying claim.

> D. The Hardship to Defendants and Other NMS Students Who Are Part of the LGBTQ+ Community Far Outweighs the Hardship to Plaintiff

Not only will Plaintiff not suffer irreparable harm, but the hardship to Defendants and students at NMS if the injunction is entered allowing Plaintiff to wear the t-shirt to school is palpable. The Supreme Court has recognized that there is a substantial interest of teachers and administrators in maintaining discipline in the classroom and on school grounds:

> Maintaining order in the classroom has never been easy, but in recent years, school disorder has often taken particularly ugly forms: drug use and violent crime in the schools have become major social problems. Even in schools that have been spared the most severe disciplinary problems, the preservation of order and a proper educational environment requires close supervision of schoolchildren, as well as the enforcement of rules against conduct that would be perfectly permissible if undertaken by an adult. Events calling for discipline are frequent occurrences and sometimes require immediate, effective action. Accordingly, we have recognized that maintaining security and order in the schools requires a certain degree of flexibility in school disciplinary procedures, and we have respected the value of preserving the informality of the student-teacher relationship.

New Jersey v. T.L.O., 469 U.S. 325, 339 (1985).

The anticipated disruption in school is not theoretical nor is the harm that will be caused to NMS students who are part of the LGBTQ+ community if Plaintiff and other students who Plaintiff alleges support his views, are allowed to wear t-shirts with the message "there are only two genders." Since Plaintiff has worn the t-shirt, there have been other students wearing t-shirts in school with the same hateful message The school Principal and Superintendent have received an onslaught of messages by e-mail and over social media, some of which have threatened them with

14

physical harm. Maintaining order and control over a large group of middle school students is difficult in the best of times, and these difficulties have become greater due to the lasting impacts that COVID era school closures have had on students. In addition, as will be described in greater detail below, all students, including those who are part of the LGBTQ+ community and their allies, have a right to attend school without being harassed and bullied by other students who wish to deny their very existence. The language in the Dress Code is applicable to all protected statuses and any determination on this language will place in jeopardy the efforts of Defendants to protect students based on any membership in a protected status including race, ethnicity, gender, sexual orientation, gender identity and religious affiliation.

Middle school teachers and administrators are required to protect the physical and emotional safety of all students. If the requested TRO is granted, the Court will effectively prevent teachers and staff from enforcing the Dress Code and will embolden students to wear demeaning and offensive clothing without fear of punishment or repercussion to the detriment of students, in this instance transgender and gender non-conforming students, who are protected by law. The harm to Defendants in the issuance of a TRO clearly outweighs any slight harm to Plaintiff.

E. <u>The Public Interest Will Be Harmed If the TRO is Granted</u>.

Finally, the public has a strong interest in the preservation of the status quo by not allowing Plaintiff to wear the disputed t-shirt unless and until he prevails on the merits of this case. Indeed, there is a substantial public interest in protecting the needs of students who are vulnerable to harassment and intimidation. As observed by the Ninth Circuit Court of appeals:

> Speech that attacks high school students who are members of minority groups that have historically been oppressed, subjected to verbal and physical abuse, and made to feel inferior, serves to injure and intimidate them, as well as to damage their sense of security and interfere with their opportunity to learn. The demeaning of young gay and lesbian students in a school environment is detrimental not only to their psychological health and well-being, but also to their educational development. Indeed, studies demonstrate that "academic underachievement,

truancy, and dropout are prevalent among homosexual youth and are the probable consequences of violence and verbal and physical abuse at school."

Harper, 445 F.3d at 1178-1179 (quoting, Susanne M. Stronski Huwiler and Gary Remafedi, Adolescent Homosexuality, 33 Rev. Jur. U.I.P.R. 151, 164 (1999)).  Likewise, this Court has acknowledged that teaching students "to respect gays and lesbians is rationally related to the legitimate pedagogical purpose of fostering an educational environment in which gays, lesbians and children of same-sex parents will be able to learn well."  Parker v. Hurley, 474 F.Supp.2d 261, 275 (D.Mass. 2007).

The public's interest in the protection of transgender and gender non-conforming students from discrimination and bullying is so strong that the Massachusetts Legislature has taken action to prevent it.  This is not "popular culture" as Plaintiff repeatedly states, but the law.  If an injunction issues that allows Plaintiff to wear the t-shirt, others will surely follow and all students in this protected class are at risk of harassment and intimidation. Clearly, the hardship to Defendants and NMS students who are part of the LGBTQ+ community and those who support them if the TRO is granted far outweighs the hardship to Plaintiff of having to wait to wear the t-shirt to school for the relatively short duration of this action.

### IV.      **CONCLUSION**

For all of the foregoing reasons, Defendants respectfully request that this honorable Court deny Plaintiff's Motion for a Temporary Restraining Order.

                    TOWN OF MIDDLEBOROUGH; TOWN OF MIDDLEBOROUGH SCHOOL COMMITTEE; CAROLYN J. LYONS, SUPERINTENDENT OF THE MIDDLEBOROUGH PUBLIC SCHOOLS, in her capacity; and HEATHER TUCKER, ACTING PRINCIPAL OF NICOLAS MIDDLE SCHOOL, in her official capacity,

By its attorneys,

*/s/ Deborah I. Ecker*

Gregg J. Corbo (BBO# 641459)
Deborah I. Ecker (BBO# 554623)
KP Law, P.C.
101 Arch Street, 12th Floor
Boston, MA  02110-1109
(617) 556-0007
gcorbo@k-plaw.com
decker@k-plaw.com

Date:  May 31, 2023

866129v5/60700/1195

17