UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

**Civil Action No. 1:23-cv-11111-IT**

| | |
|---|---|
| LM, a minor by and through his father and stepmother and natural guardians, Christopher and Susan Morrison,<br><br>     Plaintiff<br><br>v.<br><br>TOWN OF MIDDLEBOROUGH; MIDDLEBOROUGH SCHOOL COMMITTEE; CAROYLN J. LYONS, Superintendent of the Middleborough Public Schools, in her capacity; and HEATHER TUCKER, acting Principal of Nicholas Middle School, in her official capacity,<br><br>     Defendants | MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION |

## I.   __INTRODUCTION__

Defendants, Town of Middleborough, Middleborough School Committee, Carolyn J. Lyons, Superintendent of the Middleborough Public Schools in her official capacity, and Heather Tucker, Interim Principal of John T. Nicholas Middle School ("NMS") in her official capacity (collectively "Defendants"), hereby oppose Plaintiff LM's, a minor by and through his father and stepmother and natural guardians, Christopher and Susan Morrison's ("Plaintiff" or "LM") Motion for a Preliminary Injunction. ("Motion" or "PI")[1]  Plaintiff filed his Complaint and Motion after he was told to remove a t-shirt that he wore to school that had emblazoned on it the message, "there are only two genders," ("t-shirt") a message that is inherently exclusionary, diminishing and harassing to members of the LGBTQ+ community at NMS and which in essence tells transgender

---

[1] Plaintiff filed an Emergency Motion for a Temporary Restraining Order and Preliminary Injunction simultaneously. This memorandum addresses Plaintiff's request for a preliminary injunction only.

and gender nonconforming students that their gender identity, a protected status in the Commonwealth of Massachusetts, does not exist and after he wore a second t-shirt to school with the message "there are only censored genders" ("second t-shirt"). Nowhere in Plaintiff's Complaint or Motion does Plaintiff even acknowledge that gender identity is a protected status in Massachusetts.  NMS has a Dress Code, which Plaintiff incorrectly and repeatedly refers to in his Complaint as the "Speech Policy," which prohibits students from wearing any clothing that depicts imagery "that targets groups based on race, ethnicity, gender, sexual orientation, gender identity, religious affiliation or any other classification."

 Plaintiff alleges that the NMS Dress Code and Defendants' directive to Plaintiff that he remove the t-shirts, violated his First Amendment rights and his right to Due Process under the Fourteenth Amendment of the United States Constitution, and he is seeking a preliminary injunction enjoining Defendants from enforcing the Dress Code "both facially and as-applied to prohibit Plaintiff from wearing a shirt with the message 'There are only two genders' or similar messages at NMS."

As will be described in detail below, Plaintiff's Motion must be denied because he has no likelihood of success on the merits because the First Amendment does not allow public school students to display messages that infringe on the rights of other students who are members of a protected class and/or that will cause a substantial disruption in the learning environment, as is the case here; and because the public interest in the preservation of order and the protection of transgender and gender non-conforming students from discrimination and harassment is paramount and far outweighs the interests of a single student in marginalizing and derogating this vulnerable group.

II.     **FACTUAL SUMMARY[2]**

The NMS Student and Family Handbook ("Handbook"), which is provided each year to students and their families, contains a Dress Code for all students who attend NMS that provides in part that clothing worn by students "must not state, imply, or depict hate speech or imagery that target groups based on race, ethnicity, gender, sexual orientation, gender identity, religious affiliation or any other classification."  Exhibit 1, ¶ 2.

Plaintiff is a student at NMS.  Complaint, ¶ 6.  On March 21, 2023, Plaintiff wore a t-shirt to NMS with the message, "there are only two genders."  When principal Tucker was notified by the Assistant Principal, Jason Carroll, she went to speak to the Plaintiff at the start of his physical education class. She introduced herself to Plaintiff and asked him to come speak to her. Plaintiff asked the Principal if he was in trouble, to which she responded no.  Plaintiff asked the Principal if it was about his t-shirt to which the Principal responded, yes. The Principal offered Plaintiff the opportunity to change the shirt and return to PE before they left the gymnasium, but Plaintiff did not want to do so.  The Principal met with Plaintiff with a School Counselor present and asked him to remove the t-shirt before returning to class. Plaintiff declined to do so.  Despite several efforts to convince the Plaintiff to change his shirt, he continued in his refusal to change.  Exhibit 2, ¶¶ 5-7. The Principal contacted Plaintiff's father and asked that he have his son remove the t-shirt but he refused. Plaintiff's father then came to school and dismissed Plaintiff from school for the rest of the  day indicating that he preferred this course of action over removal of Plaintiff's t-shirt. Exhibit 2, ¶ 8.  Plaintiff was not the subject of any discipline for having worn the t-shirt to school.  Exhibit 2, ¶ 9.

---

[2] The facts supporting this opposition are set forth in the Affidavits of Superintendent Carolyn Lyons, Principal Heather Tucker and Assistant Principal Jason Carroll, which are incorporated herein and are summarized here for the Court's convenience as Exhibits 1 and 2.

When Plaintiff's father reached out to the Superintendent about the incident, the Superintendent supported the Principal's enforcement of the Dress Code and referred Plaintiff's father to language in the Dress Code advising him that the content of Plaintiff's shirt targeted students of a protected class, namely in the area of gender identity. Exhibit 1, ¶ 4. On April 13, 2023, there were two individuals outside of NMS, but not on school property, holding signs that read, "there are only two genders" and "keep woke politics out [of] our schools." Although not on school property, the protesters were stationed at the entrance to the bus drop-off area, and they were in plain view of students as they entered school grounds. Exhibit 1, ¶ 5; Exhibit 2, ¶¶ 13 and 14. The Superintendent received complaints from the LGBTQ+ community members. Exhibit 1, ¶ 6. Both the Superintendent and Plaintiff spoke at the School Committee meeting that night. Exhibit 1, ¶ 7. On April 14, 2023, counter protests were held outside of NMS with signs that read, "trans people belong" and "we support trans rights" and "everyone is welcome here" among other messages. Exhibit 1, ¶ 8; Exhibit 2, ¶ 15. The Superintendent received complaints from community members about those messages as well. Exhibit 1, ¶ 9. The incident involving Plaintiff's t-shirt became the subject of local and national news coverage that included interviews of Plaintiff and significant discussion on social media amongst students, parents and others. Defendants received an ongoing stream of hateful messages, tweets, emails and phone calls some threatening. Exhibit 1, ¶ 10; Exhibit 2, ¶ 17. As a result, the Middleborough Police Department provided additional support to NMS. Exhibit 1, ¶¶ 9-11.

Since the March 21, 2023 incident involving the t-shirt, Plaintiff has expressed his views on transgender rights on local and national news media outlets, radio broadcasts, and social media. Exhibit 1, ¶ 12. Plaintiff was permitted to express his political views and protest Defendants' decision that he remove the t-shirts through clothing while at school with messages including "Don't Tread on Me," "First Amendment Rights," "Freedom Over Fear," and "Let's

4

Go Brandon."  Plaintiff was not asked to remove this clothing or disciplined for his messages.

Exhibit 2, ¶¶ 11 and 12.

On April 27, 2023, the Superintendent received correspondence from an attorney

purporting to represent Plaintiff claiming that he was intending to wear a shirt bearing the phrase

"There Are Only Two Genders" to school on May 5, 2023.  On May 1, 2023 NMS staff received

over fifty (50) telephone messages that contained hateful and lewd messages after the news

coverage about Plaintiff broke. These calls continued across this and the following week to a

lesser degree.  Exhibit 2, ¶ 17 and 26. Prior to May 5, 2023, the Superintendent met with

Principal Tucker and the School's attorney concerning the letter from Plaintiff's attorney. Given

the amount of media attention the subject had garnered, there were concerns not only that other

students would also attempt to wear clothing with the same or similar messages, but also that if

Plaintiff wore the same or similar t-shirt on May 5, 2023 that it would cause significant

disruption in the school and would place students in the LGBTQ+ community in fear for their

safety.  Exhibit 1, ¶¶ 12-15; Exhibit 2, ¶ 18.

On May 5, 2023, Plaintiff arrived at NMS and was observed by the Principal wearing a t-

shirt with the message "there are only censored genders," covering the word "two" with the word

"censored."  Exhibit 1, ¶ 16.   To avoid disruption and having to remove Plaintiff from class, the

Assistant Principal brought Plaintiff to his office before the school day started.  The Assistant

Principal waited in the doorway of his office while the Principal and Superintendent conferred

with School Counsel.  When Principal Tucker entered the Assistant Principal's office, Plaintiff

had already removed his shirt.  Exhibit 3 – Affidavit of Assistant Principal, ¶¶  4 and 5. Principal

Tucker told Plaintiff that he could either keep the t-shirt in his backpack for the rest of the day or

that they would keep it in the office. Plaintiff chose to put the t-shirt into his backpack.  Exhibit

3, ¶ 5. Plaintiff was not disciplined for wearing the t-shirt to school on May 5, 2023 and was

allowed to proceed with his school day in the normal course.  Exhibit 1, ¶¶ 16-20; Exhibit 2, ¶¶ 19-23.

On or about Tuesday, May 9, 2023, two additional students appeared at school with t-shirts bearing the slogan "There Are Only Two Genders." Both students were required to meet with the Principal and were required to change their shirts. The Principal explained to each student the reasons for her decision. One student complied and was allowed to return to class. The other refused to remove the shirt and the student's parents were called. The Principal met with the student's mother, in person, at NMS. Following this meeting, the student went home as the school day was over. Neither student was disciplined as a result of wearing the shirt.  Exhibit 2, ¶ 24.

To further the goal of providing support to students who are part of the LGBTQ+ community, the NMS has a Gay Straight Alliance (GSA) club that has existed since at least 2018. The GSA has over 20 members and typically meets on a monthly basis. The GSA is a "student-run organization that unites LGBTQ+ and allied youth to build community and organize around issues impacting them in their schools and communities." Exhibit 1, ¶ 22; Exhibit 2, ¶ 31.  Student survey data collected in June 2022, shows over 20 individual students' comments about perceived bullying at school, feeling unwelcome at school, and expressing specific concerns about how the LGBTQ+ population is treated at school.  Exhibit 1, ¶ 23.  To further the goal of providing support to students who are part of the LGBTQ+ community, in January 2022 NMS trained teachers and staff on the NMS Safe Schools Program for LGBTQ Students and revised its Gender Support Plan to support students while they are at NMS. The World of Difference student group from Middleborough High School, trained by the Anti-Defamation League (ADL), provided anti-bias training to all teachers and staff on May 27, 2022. Most

recently, the ADL provided anti-bias professional development to all teachers and staff on January 13, 2023.  Exhibit 1, ¶ 23.

The Superintendent and Principal are aware of several NMS students who have attempted to commit suicide or have had suicidal ideations in the past few years, including members of the LGBTQ+ community. These situations have frequently cited LGBTQ+ status and treatment as a major factor. In July 2022, one MHS student committed suicide.  Exhibit 1, ¶ 25; Exhibit 2, ¶31.

## III.   <u>LEGAL ARGUMENT</u>

### A.   <u>Preliminary Injunction Standard</u>

In evaluating a motion for preliminary injunction the Court applies the familiar four-factor analysis:(1) the likelihood of the movant's success on the merits;  (2) the potential for irreparable harm to the movant if the injunction is denied; (3) a balancing of the relevant impositions, *i.e.,* the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect on the public interest of a grant or denial of the injunction. <u>Voice of the Arab World, Inc.</u> v. <u>MDTV Medical News Now, Inc.</u>, 645 F.3d 26, 32 (1st Cir. 2011).

### B.   <u>Plaintiff is Not Likely to Prevail on the Merits of His First Amendment Claim.</u>

#### 1.   <u>First Amendment Standard for Speech in Public Schools</u>

Plaintiff cannot prevail on his First Amendment claim because his speech was not protected while at NMS. In the Commonwealth of Massachusetts the legislature has determined that gender identity should be protected generally and specifically in schools.  G.L. c. 76, § 5 prohibits discrimination on the basis of gender identity against students who enroll in or attend public schools.  <u>See</u> An Act Relative to Gender Identity (Chapter 199 of the Acts of 2011).  The Massachusetts school bullying statute, G.L. c. 71, § 37O, which protects students from becoming targets of bullying or harassment based on actual or perceived differentiating characteristics, including gender identity or expression on school grounds and at school sponsored and related

activities, requires schools to develop anti-bullying plans that recognize the vulnerability of certain students. The regulations promulgated by the Massachusetts Board of Elementary and Secondary Education ("DESE") to implement the protection accorded gender identity requires school districts to provide students with a safe a supportive environment to progress academically and developmentally.  Those regulations require that '[a]ll public school systems shall, through their curricula, encourage respect for the human and civil rights of all individuals regardless of gender identity.'"  Foote v. Town of Ludlow, 2022 WL 18356421 (Civil Action No. 22030041-MGM, Slip Copy (2022)) (quoting, 603 C.M. R. § 26.05).[3]   In addition, DESE has issued Guidance to help school district administrators take steps to create a culture in which transgender and gender nonconforming students feel safe, supported and fully included, and to meet each school's obligation to provide equal educational opportunities to all students.  Exhibit 1, Exhibit D.

It is in the context of the legal protection accorded gender identity that the principals established by the U.S. Supreme Court in Tinker v. U.S., 393 U.S. 503 (1996) establishing the framework for the analysis of free speech rights in public schools must be analyzed.  The Supreme Court has long held that schools have a special interest in regulating speech that 'materially disrupts classwork or involves substantial disorder or invasion of the rights of others.'"  Doe v. Hopkinton Public Schools, 19 F.4th 493 (2021) (quoting Tinker, supra.),  "'Courts generally defer to school administrators' decisions regarding student speech so long as their judgment is reasonable.'"  Id., at 505 (quoting Norris ex rel. A.M. v. Cape Elizabeth Sch. Dist., 969 F.3d 12, 30 (1st Cir. 2020)). "School administrators must be permitted to exercise discretion in determining when certain speech crosses the line from merely offensive to more severe or pervasive bullying or harassment".  Norris, at 29, n. 18. "[T]he Tinker standard acknowledges the broad authority of

---

[3] While the District Court case does not have precedential value because it was not published in the Federal Supplement, it is worth noting that the Court ((Mastroianni, J.) recognized the DESE guidance.

school officials to maintain order and discipline and establish conditions in the school environment that are conducive to learning, '[W]e must not ignore the Supreme Court's admonition that a school need not tolerate student speech that is inconsistent with its basic educational mission.'" N.J. by Jacob v. Sonnabend, 37 F.4th 412 (7th Cir. 2022) quoting, Brandt v. Bd. Of Educ., 480 F.3d 460, 467 (7th Cir. 2007). "The application of *Tinker* must account for such factors as the age and grade level of the students to whom the speech is directed and any factors particular to the educational environment or history of school or student body in question. Temporal factors and recent events might be relevant." Id., citing Tinker, 393 U.S. at 507. "The *Tinker* inquiry also accounts for the professional knowledge and experience of school administrators in setting and enforcing disciplinary standards." Id. citing Tinker, 393 U.S. at 507 ("[T]he Court has repeatedly emphasized the need for affirming the comprehensive authority . . . of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in schools.").

Furthermore, the analysis of whether student speech is protected is fact specific. Defendants are not required to prove that "unless the speech at issue is forbidden serious consequences will in fact ensue. See, Nuxoll ex rel. Nuxoll v. Indian Prairie School Dist. #204, 523 F.3d 668 (7th Cir. 2008). "It is enough for a school to present "facts which might reasonably lead school officials to forecast substantial disruption.'" Id. at 673, quoting Boucher v. School Board of School District of Greenfield, 134 F. 3d 821, 827-828 (7th Cir. 1998). "In the school context, the crucial distinction is the nature of the speech, not the source of it. The cases do not distinguish between 'substantial disruption' caused by the speaker and 'substantial disruption' caused by the reactions of onlookers or a combination of circumstances." Dariano, 767 F.3d at 778; *citing* Taylor v. Roswell Indep. Sch. Dist., 713 F.3d 25, 38, 38 n. 11 (10th Cir.2013). As a result, "' Courts generally defer to school administrators' decisions regarding student speech so long as their judgment is reasonable." Doe v. Hopkinton Public Schools, 19 F.4th at 505 (quoting

<u>Norris ex rel. A.M.</u> v. <u>Cape Elizabeth Sch. Dist.</u>, 969 F.3d 12, 30 (1ˢᵗ Circ. 2020)).  "School administrators must be permitted to exercise discretion in determining when certain speech crosses the line from merely offensive to more severe or pervasive bullying or harassment."  <u>Norris</u>, at 29, n. 18.

2.   <u>The Message of the First Shirt Was Not Protected in the School Context</u>

With respect to this first shirt, Defendants had specific knowledge of the vulnerability of students who are members of the LGBTQ+ community (a protected class) and an interest in supporting the existence and rights of these students.  Student survey data collected in June 2022 showed over 20 individual students' comments about perceived bullying at school, feeling unwelcome at school, and expressing specific concerns about how the LGBTQ+ population is treated at school.  Exhibit 1, ¶ 22.  The Superintendent and Principal Tucker are aware of several NMS students who have attempted to commit suicide or have had suicidal ideations in the past few years, including members of the LGBTQ+ community. These situations have frequently cited LGBTQ+ status and treatment as a major factor. Exhibit 1, ¶ 25; Exhibit 2, ¶ 22.  In addition to this site-specific information, the vulnerability of students in the LGBTQ+ community is well documented.  Studies have shown that sexual minority and transgender youth face significantly more forms of peer victimization compared to heterosexual and non-transgender peers[4]. Transgender youth consistently reported higher levels of truancy and absenteeism, general victimization, sexual orientation and gender-based bullying, and had more negative perceptions of the climates of their schools, compared to their non-transgender peers[5].  Other studies have shown that openness, validation, and support of gender diversity at school can positively affect

---

[4] Greta R. Bauer et al., Intervenable factors associated with suicide risk in transgender persons: a respondent driven sampling study in Ontario, Canada, BMC Public Health, June 2015, https://bmcpublichealth.biomedcentral.com/articles/10.1186/s12889-015-1867-2.

[5] Jack K. Day et al., Safe Schools? Transgender Youth's School Experiences and Perceptions of School Climate, Journal of Youth and Adolescence, Aug. 2018, https://pubmed.ncbi.nlm.nih.gov/29858740/.

transgender youths' well-being. Conversely, various forms of non-recognition of gender identity, victimization and bullying towards transgender youths impede their wellbeing[6].

Against the backdrop of their own personal knowledge, documented studies, state statutes, regulations and DESE guidance, Defendants reasonably determined that the message on Plaintiff's t-shirt that attempted to extinguish the gender identity of transgender and gender non-conforming students did not create a culture in which transgender and gender nonconforming students would feel safe, fully supported and fully included at school. "Public school students who may be injured by verbal assaults on the basis of core identifying characteristics such as race, religion, or sexual orientation have a right to be free from such attacks while on school campuses. . . . Being secure involves not only freedom from physical assaults but from psychological attacks that cause young people to question their self-worth and their rightful place in society."   Harper v. Poway Unified School District, 445 F.3d 1166, 1178 (9th Cir. 2006), cert. granted and vacated as moot, 549 U.S. 1262, 127 S.Ct. 1484, 167 L.Ed. 2d 225 (2007).

In light of the foregoing, it is clear that Defendants' decision that Plaintiff's message on the first t-shirt would invade the rights of others, the rights of particularly vulnerable students who are members of the LGTBQ+ community (a protected class) to feel safe in school and to be free from harassment and bullying while in school, was reasonable.  It was, likewise, reasonable for the Defendants to conclude that the Plaintiff's shirt would materially disrupt classwork or involve substantial disorder in the school.  The student population at NMS is between 10 and 14 years old and despite the young age of its students, NMS has an active LGBTQ+ community.  NMS has a Gay Straight Alliance (GSA) club that has existed since at least 2018. The GSA has over 20 members and typically meets on a monthly basis. The GSA is a "student-run organization that

---

[6] Jamie Kelley, et al., School Factors Strongly Impact Transgender and Non-Binary Youths' Well-Being, Children-Basel, Oct. 2022, https://pubmed.ncbi.nlm.nih.gov/36291456/.

unites LGBTQ+ and allied youth to build community and organize around issues impacting them in their schools and communities." Exhibit 1, ¶ 21; Exhibit 2, ¶ 31.  The level of self-advocacy expressed by this group of students strongly suggests that they would not sit idly by and allow someone to deny their very existence.  It was, therefore, reasonable for the Defendants to take proactive measures to ensure the integrity of the learning environment in NMS.  After all, *Tinker* does not require that school officials wait until the horse has left the barn to close the door. Barr v. Lafon, 538 F.3d 554, 568 (6th Cir.  2008) (quoting, Lowery v. Euverard, 497 F.3d 584, 591-2 (6th Cir. 2007)).

### 3.   *Tinker* Does Not Require that Offensive Comments Target a Specific Individual

Relying on *Norris*, the Plaintiff claims that the Defendants cannot rely on the fact that his shirts infringed on the rights of others because the shirts did not target a specific individual.  This argument misses the mark.  In this regard, the facts of *Norris* are distinguishable because the defendants in that case characterized the speech at issue as bullying a specific individual.  That is not the case here, where the Plaintiff's shirts target an entire protected class of individuals.  In such circumstances, courts have consistently upheld prohibitions on speech that attempt to derogate groups based on their protected class status. For example, in Sapp v. School Bd. of Alachua County, Fla., 2011 WL 5084647 (N.D.Fla. 2011), the Court held that the school district properly prohibited students from wearing clothing with the words "Islam is of the Devil".  In so holding, the Court acknowledged that:

> "Islam is of the Devil" presents a highly confrontational message. It is akin to saying that the religion of Islam is evil and that all of its followers will go to hell. The message is not conducive to civil discourse on religious issues; nor is it appropriate for school generally. "Part of a public school's mission must be to teach students of differing races, creeds and colors to engage each other in civil terms rather than in terms of debate highly offensive or highly threatening to others." Scott, 324 F.3d at 1249 (quoting West v. Derby Unified Sch. Dist. No. 260, 23 F.Supp.2d 1223, 1233– 34 (D.Kan.1998).

Likewise, in Scott v. School Bd. of Alachua County, 324 F.3d 1246 (2003), the Court

upheld a ban on the display of the Confederate flag by students in school because "the district had concluded that the display of certain symbols that have become associated with racial prejudice are so likely to provoke feelings of hatred and ill will in others that they are inappropriate in the school context."; and in *Harper*, the Court found that a prohibition of a shirt bearing the words "BE ASHAMED, OUR SCHOOL EMBRACED WHAT GOD HAS CONDEMNED" handwritten on the front, and "HOMOSEXUALITY IS SHAMEFUL" handwritten on the back, did not violate students' First Amendment rights because the speech intruded upon the rights of other students. Harper, at 1185. In each of these cases, the courts recognized the interest of public schools in protecting children from hateful speech at school, and in teaching students the bounds of civil discourse and that the messages infringed on the rights of others, even without a showing that the messages were targeted at specific individuals. The t-shirts worn by the Plaintiff in this case are no different than other messages and symbols that courts have found unworthy of protection under the First Amendment in the school context because they diminish, provoke and derogate students in a protected class. Therefore, the plaintiff has no likelihood of success on the merits of this First Amendment Claim.

4. <u>The Message of the Second Shirt Was Not Protected in the School Context</u>

As with the message on Plaintiff's first t-shirt, Defendants reasonably forecasted that the message on Plaintiff's second t-shirt, that merely replaced the word "two" with the word "censored," would not only make the LGBTQ+ students feel unsafe and excluded in the educational environment but would also cause a substantial disruption in the school and was inconsistent with NMS basic educational mission of inclusivity and creating a safe welcoming environment for all students to learn. Plaintiff's intent in wearing the shirt is irrelevant. <u>See</u>, <u>Hardwick ex rel. Hardwick</u> at 439 (Plaintiff's intent that her Confederate flag shirts be only a symbol of her heritage and religious faith is irrelevant. The proper focus is whether school officials

could predict that the Confederate flag shirts would cause a disruption.). Courts that have considered whether student speech is protected under the First Amendment have considered the speech in the context in which it occurred and any factors particular to the education environment, the student body in question as well as temporal factors and recent events.  See, Dariano v. Morgan Hill Unified School Dist., 767 F.3d 764 (2014) (restrictions on students' ability to wearing clothing depicting the American flag were reasonable in light of past racial altercations at the school).

Here, Defendants did not make the decision to have Plaintiff remove the second t-shirt in a vacuum. By the time Plaintiff wore the second t-shirt, the cat was already out of the bag so to speak, and in light of the temporal proximity of the two shirts, the covering of the word "two" with the word "censored" did nothing to hide the message that Plaintiff was sending – his view that the gender identity of transgender and gender non-conforming students did not exist.  Context matters when determining whether Plaintiff's message was protected speech, not Plaintiff's intent. The application of *Tinker* to Plaintiff's second t-shirt must take into account the history of disruption caused by Plaintiff wearing the first shirt, that included the protests outside of school, other students wearing the same t-shirt, the media coverage and the hateful messages received by the school administration that led to additional police support at NMS. Plaintiff's attorney himself linked the two shirts by making Defendants aware that Plaintiff was going to wear the same shirt to school on May 5, 2023.  Defendant could reasonably forecast that Plaintiff's second shirt would cause disruption and would interfere in the rights of other students under the circumstances.

The anticipated and inevitable disruption that would follow if Plaintiff continued to wear either t-shirt in school denying the existence of a protected class of students and the rights of transgender and gender non-conforming students to attend school free of discrimination, fear, harassment, and bullying is evident.  School officials acted reasonably in determining that it was necessary to make the plaintiff change his shirt to prevent such disruption and they were not

required to "wait until the horse has left the barn before closing the door." <u>Barr</u>, at 568.  Therefore, because Plaintiff's second t-shirt in the school setting denying the gender identity of a class of students that the law protects, is not protected speech under the First Amendment, Plaintiff has no likelihood of success on the merits of this First Amendment Claim.

    5.  <u>Plaintiff Was Not Subjected to An Adverse Action</u>

       Assuming arguendo that Plaintiff's speech was protected by the First Amendment, Plaintiff will still not be able to prevail on his First Amendment claim because he was not subjected to an adverse action. To prevail on his First Amendment claim under 42 U.S.C. § 1983, Plaintiff bears the burden of showing that (1) he was engaged in constitutionally protected conduct, (2) he was subjected to adverse actions by the School, and (3) the protected conduct was a substantial or motivating factor in the adverse actions. <u>Doe</u> v. <u>Hopkinton</u>, 19 F.4[th] 493 (1st Cir. 2021); citing, <u>D.B. ex rel. Elizabeth B.</u> v. <u>Esposito</u>, 675 F.3d 26, 43 (1st Cir. 2012).  Putting aside for the moment whether Plaintiff engaged in constitutionally protected conduct by wearing the t-shirts, Plaintiff will not be able to prevail on his First Amendment claim because Plaintiff was not subjected to an adverse action by Defendants because he wore the t-shirts. <u>Dariano</u> v. <u>Morgan Hill Unified School Dist.</u>, 767 F.3d 764, 777 (9th Cir. 2014), *quoting*, <u>Karp</u> v. <u>Becken</u>, 477 F.2d 171, (9th Cir. 1973) (No violation of the First Amendment where students were restricted from wearing certain clothing but were not suspended or otherwise disciplined for doing so).

       Plaintiff in fact, was not disciplined in any way.  Instead, with respect to the first shirt, Plaintiff's father chose to remove his child from school for the day on March 21, 2023 rather than allow him to change his shirt; and with respect to the second shirt, the Plaintiff voluntarily removed it and agreed not to put it back on.  Since that time, Plaintiff has had ample opportunities to express himself other than by wearing the t-shirts at issue to school.  He has spoken publicly at a school committee meeting, he has been interviewed by news organizations as well as radio stations, and

he is able to post his views on social media.  Plaintiff has been permitted to speak out and protest Defendants' decision while at school for example by wearing clothing with messages that included, " Don't Treat on Me," "First Amendment Rights," and "Freedom Over Fear" without incident.   Given the ample alternative means afforded the plaintiff to express himself, the Defendants' actions were narrowly tailored to protect the rights of other students and prevent disruptions and as such did not run afoul of the First Amendment.  *Id.*  Therefore, because Plaintiff will not be able to establish the second and third prong of his First Amendment claim, he cannot succeed on the merits of his claim, and as a result his request for a PI should be denied.

6.   Plaintiff Lacks Standing to Challenge the Dress Code

Finally, because Plaintiff's speech was not protected by the First Amendment, Plaintiff does not have Article III standing to challenge the language contained in the Dress Code.  See, Doe, at 510, citing, Osediacz v. City of Cranston, 414 F.3d 136, 140-41 (1st Cir. 2005).  Even if Plaintiff had standing to challenge the language of the Dress Code, his overbreadth argument fails because the Dress Code by prohibiting clothing that implies or depicts imagery or hate speech that target groups based among other protected categories, sexual orientation or gender identity, comport with the laws and regulations that protects students from discrimination, harassment and bullying.  Plaintiff's message suggesting that their gender identity was invalid clearly was harassing in nature and directed at transgender and gender non-conforming students.  Plaintiff's attempt to compare his message with those allowed within NMS unsuccessfully attempts to create a false equivalence as the messages contained in his Complaint are all messages of inclusion seeking to support students and members of the NMS community who are members of protected classes, as opposed to Plaintiff's message that sought to exclude and to deny the identity of transgender and gender non-conforming students.

C.     Plaintiff Does Not Have a Likelihood of Success on his Due Process Claim.

In Count two of his Complaint Plaintiff alleges that the Dress Code both facially and as applied violates the Due Process Clause of the Fourteenth Amendment.  Complaint, ¶¶ 154-159. Plaintiff does not articulate the basis for his due process claim and what process he claims he is or was due.  Plaintiff omits from his Complaint, that if he or others had been disciplined for violating the Dress Code, the Student Handbook provides disciplinary guidelines and procedures.  The fact is Plaintiff was not disciplined and was not denied any type of due process that may have been owed to him had he been.  Accordingly, because Plaintiff does not have a likelihood of success on the merits of his Due Process Claim.

D.     Plaintiff Will Not Suffer Irreparable Harm if the Injunction Is Not Granted

Assuming arguendo that Plaintiff is able to meet his burden of showing a likelihood of success on the merits of his claims, Plaintiff will not be able to show that he will suffer irreparable harm if the injunction is not granted by not being allowed to wear the two t-shirts. Plaintiff has had ample alternative means for expressing his views, including speaking at public school committee meetings, giving interviews to news outlets, protesting outside of school grounds and posting on social media.   The Plaintiff will not suffer irreparable harm by not being allowed to wear the t-shirt in school while the Court determines the merits of Plaintiff's underlying claim.

E.     The Hardship to Defendants and Other NMS Students Who Are Part of the LGBTQ+ Community Far Outweighs the Hardship to Plaintiff

Not only will Plaintiff not suffer irreparable harm, but the hardship to Defendants and students at NMS if the injunction is entered allowing Plaintiff to wear the t-shirt to school is palpable.  The Supreme Court has recognized that there is a substantial interest of teachers and administrators in maintaining discipline in the classroom and on school grounds:

Maintaining order in the classroom has never been easy, but in recent years, school disorder has often taken particularly ugly forms: drug use and violent crime in the schools have

17

become major social problems. Even in schools that have been spared the most severe disciplinary problems, the preservation of order and a proper educational environment requires close supervision of schoolchildren, as well as the enforcement of rules against conduct that would be perfectly permissible if undertaken by an adult. Events calling for discipline are frequent occurrences and sometimes require immediate, effective action. Accordingly, we have recognized that maintaining security and order in the schools requires a certain degree of flexibility in school disciplinary procedures, and we have respected the value of preserving the informality of the student-teacher relationship.

New Jersey v. T.L.O., 469 U.S. 325, 339 (1985).

The anticipated disruption in school is neither theoretical nor is the harm that will be caused to NMS students who are part of the LGBTQ+ community if Plaintiff and other students who Plaintiff alleges support his views, are allowed to wear t-shirts with the message "there are only two genders." Since Plaintiff has worn the t-shirt, there have been other students wearing t-shirts in school with the same hateful message. The school Principal and Superintendent have received an onslaught of messages by e-mail and over social media, some of which have threatened them and others with physical harm. Maintaining order and control over a large group of middle school students is difficult in the best of times, and these difficulties have become greater due to the lasting impacts that COVID era school closures have had on students. In addition, as will be described in greater detail below, all students, including those who are part of the LGBTQ+ community and their allies, have a right to attend school without being harassed and bullied by other students who wish to deny their very existence. The language in the Dress Code is applicable to all protected statuses and any determination on this language will place in jeopardy the efforts of Defendants to protect students based on any membership in a protected status including race, ethnicity, gender, sexual orientation, gender identity and religious affiliation.

Middle school teachers and administrators are required to protect the physical and emotional safety of all students. If the requested preliminary injunction is granted, the Court will effectively prevent teachers and staff from enforcing the Dress Code and will embolden students

18

to wear demeaning and offensive clothing without fear of punishment or repercussion to the detriment of students, in this instance transgender and gender non-conforming students, who are protected by law.  The harm to Defendants in the issuance of a preliminary injunction clearly outweighs any slight harm to Plaintiff.[7]

      F.    <u>The Public Interest Will Be Harmed If the Injunction is Granted</u>.

      Finally, the public has a strong interest in the preservation of the status quo by not allowing Plaintiff to wear the disputed t-shirt unless and until he prevails on the merits of this case.   Indeed, there is a substantial public interest in protecting the needs of students who are vulnerable to harassment and intimidation.  As observed by the Ninth Circuit Court of appeals:

> Speech that attacks high school students who are members of minority groups that have historically been oppressed, subjected to verbal and physical abuse, and made to feel inferior, serves to injure and intimidate them, as well as to damage their sense of security and interfere with their opportunity to learn.  The demeaning of young gay and lesbian students in a school environment is detrimental not only to their psychological health and well-being, but also to their educational development. Indeed, studies demonstrate that "academic underachievement, truancy, and dropout are prevalent among homosexual youth and are the probable consequences of violence and verbal and physical abuse at school."

<u>Harper</u>, 445 F.3d at 1178-1179 (quoting, Susanne M. Stronski Huwiler and Gary Remafedi, Adolescent Homosexuality, 33 Rev. Jur. U.I.P.R. 151, 164 (1999)).  Likewise, this Court has acknowledged that teaching students "to respect gays and lesbians is rationally related to the legitimate pedagogical purpose of fostering an educational environment in which gays, lesbians and children of same-sex parents will be able to learn well." <u>Parker</u> v. <u>Hurley</u>, 474 F.Supp.2d 261, 275 (D.Mass. 2007).

      The public's interest in the protection of transgender and gender non-conforming students from discrimination and bullying is so strong that the Massachusetts Legislature has taken action

---

[7] In his Supplemental Memorandum, Plaintiff repeatedly refers to his "viewpoint" on gender and his "own identity" totally negating that gender identity is a protected status in Massachusetts.  Again, Plaintiff has had ample opportunity and has expressed his views on gender outside of the school setting.

to prevent it.  This is not "popular culture" as Plaintiff repeatedly states, but the law.  If an injunction issues that allows Plaintiff to wear the t-shirt, others will surely follow and all students in this protected class are at risk of harassment and intimidation. Clearly, the hardship to Defendants and NMS students who are part of the LGBTQ+ community and those who support them if the PI is granted far outweighs the hardship to Plaintiff of not being able to express his views in this one particular way.

IV.    **CONCLUSION**

For all of the foregoing reasons, Defendants respectfully request that this honorable Court deny Plaintiff's Motion for a Preliminary Injunction.

TOWN OF MIDDLEBOROUGH; TOWN OF MIDDLEBOROUGH SCHOOL COMMITTEE; CAROLYN J. LYONS, SUPERINTENDENT OF THE MIDDLEBOROUGH PUBLIC SCHOOLS, in her capacity; and HEATHER TUCKER, ACTING PRINCIPAL OF NICOLAS MIDDLE SCHOOL, in her official capacity,

By its attorneys,

Gregg J. Corbo (BBO# 641459)
Deborah I. Ecker (BBO# 554623)
KP Law, P.C.
101 Arch Street, 12th Floor
Boston, MA  02110-1109
(617) 556-0007
gcorbo@k-plaw.com
decker@k-plaw.com

Date:  June 9, 2023

867597/60700/1195

<u>**CERTIFICATE OF SERVICE**</u>

I, Deborah I. Ecker certify that the above document will be served by first-class mail upon any party or counsel of record who is not a registered participant of the Court's ECF system, upon notification by the Court of those individuals who will not be served electronically.

Date:  June 9, 2023

Deborah I. Ecker, Esq.