UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| L.M., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 1:23-cv-11111-IT |
| | * | |
| TOWN OF MIDDLEBOROUGH; | * | |
| MIDDLEBOROUGH SCHOOL | * | |
| COMMITTEE; Carolyn LYONS, | * | |
| Superintendent of the Middleborough Public | * | |
| Schools, in her official capacity; and | * | |
| HEATHER TUCKER, acting Principal of | * | |
| Nichols Middle School, in her official | * | |
| capacity, | * | |
| | * | |
| Defendants. | * | |

MEMORANDUM & ORDER

June 16, 2023

TALWANI, D.J.

Plaintiff L.M., a minor, by and through his father and stepmother, alleges violations of

his First and Fourteenth Amendment rights by Defendants Town of Middleborough, the

Middleborough School Committee (the "School Committee"), and two school administrators.

Verified Compl. [Doc. No. 11]. Pending before the court is L.M.s Motion for a Preliminary

Injunction [Doc. No. 12], which Defendants oppose.

I.      Background

Nichols Middle School ("Nichols") is a public middle school in Middleborough,

Massachusetts. Verified Compl. ¶ 43 [Doc. No. 11]. Defendant Carolyn Lyons is the

Superintendent of Middleborough Public Schools, and Defendant Heather Tucker is the acting

Principal of Nichols. Id. ¶¶ at 26, 36.

Student survey data collected in June 2022 at Nichols "show over 20 individual student[] comments about perceived bullying at school, feeling unwelcome at school, and expressing specific concerns about how the LGBTQ+ population is treated at school." Affidavit of Carolyn Lyons ("Lyons Aff.") ¶ 23 [Doc. No. 45]. Lyons is aware of several Nichols students, including "members of the LGBTQ+ community," having attempted to commit suicide or having had suicidal ideations, and that "[t]hese situations have frequently cited LGBTQ+ status and treatment as a major factor." Id. at ¶ 25. In July 2022, one Middleborough High School student committed suicide. Id.; see also Second Affidavit of Heather Tucker ("Tucker Aff.") ¶ 32 [Doc. No. 46] (Tucker was informed of the student suicide). Before assuming her position at Nichols, Tucker had met with parents of students and students themselves who have been bullied "because of the lack of acceptance of their gender identify." Tucker Aff. ¶ 2 [Doc. No. 46]. Tucker has also worked closely with students who have been hospitalized for attempted suicide or suicidal ideation or who have self-harmed "because of their gender identity." Id. Tucker is aware of several students at Nichols who identify as "transgender or gender nonconforming." Id. at ¶ 31.

In January 2022, May 2022, and January 2023, teachers and staff at Nichols received training "to further the goal of providing support to students who are part of the LGBTQ+ community." Lyons Aff. ¶ 24 [Doc. No. 45].

Nichols promotes messages commonly associated with "LGBTQ Pride." Affidavit of L.M. ("L.M. Aff.") ¶ 5 [Doc. No. 43]. Nichols also observes events like "Pride Month," and "Pride Day" in support of the "LGBTQ+ community." Tucker Aff. ¶ 27 [Doc. No. 46]. Nichols has had a Gay Straight Alliance Club since at least 2018, "[t]o further the goal of providing support to students who are part of the LGBTQ+ community." Lyons Aff. ¶ 22 [Doc. No. 45].

The club is a student-run organization, id., that is intended as a space for students who "fit under the LGBTQ+ umbrella or are their allies." Tucker Aff. ¶ 31 [Doc. No. 46]. Generally, approximately ten to twenty students attend the club meetings. Id.

Each year, students and their families are provided with the Nichols Jr. Middle School Student & Family Handbook (the "Handbook"). Tucker Aff. ¶ 3 [Doc. No. 46]. The Handbook includes a Code of Conduct with a dress code (the "Dress Code"). Verified Compl. Ex. C 44-45 [Doc. No. 11-3]. The Dress Code provides, in relevant part, that Nichols:

> expect[s] all students to conform to the following:
>
> ….
>
> - Clothing must not state, imply, or depict hate speech or imagery that target groups based on race, ethnicity, gender, sexual orientation, gender identity, religious affiliation, or any other classification.
>
> - Any other apparel that the administration determines to be unacceptable to our community standards will not be allowed.

Id. The Dress Code states further that "[i]f students wear something inappropriate to school, they will be asked to call their parent/guardian to request that more appropriate attire be brought to school. Repeated violations of the [D]ress [C]ode will result in disciplinary action." Id.

L.M. is a twelve-year old student at Nichols. L.M. Aff. ¶ 2 [Doc. No. 43]. L.M. and his father both signed an acknowledgment form at the beginning of the 2022-2023 school year reflecting that each "understand[s] the regulations and policies of [Nichols] contained in the Student/Parent Handbook for 2022-20223" and that L.M., as a student, "is responsible for following the regulations and policies of [Nichols]." Lyons Aff., Ex. B, Nichols Handbook 80 [Doc. No.45-2].

On March 21, 2023, L.M. attended school at Nichols in a t-shirt with the message "THERE ARE ONLY TWO GENDERS" (the "Shirt"). L.M. Aff. ¶ 14 [Doc. No. 43].[1] While L.M. was participating in gym class, Principal Tucker asked L.M. to come speak with her. Id. at ¶ 15; Tucker Aff. ¶ 6 [Doc. No. 46]. Tucker informed L.M. that he could not wear the Shirt because of complaints, and that he could either remove the Shirt or discuss it further in another room. L.M. Aff. ¶ 15 [Doc. No. 43]; Tucker Aff. ¶ 6 [Doc. No. 46]. L.M. indicated he would like to discuss it further and Tucker escorted him to another room, where the school counselor joined the conversation. L.M. Aff. ¶ 16 [Doc. No. 43]; Tucker Aff. ¶ 7 [Doc. No. 46]. Tucker reiterated that some students and staff complained that the Shirt made them upset, and that L.M needed to remove the Shirt to return to class. L.M. Aff. ¶ 18 [Doc. No. 43]. L.M. declined and Tucker called L.M.'s father. L.M. Aff. ¶ 18 [Doc. No. 43]; Tucker Aff. ¶ 8 [Doc. No. 46]. Tucker explained to L.M.'s father that L.M. could not return to class if he did not remove the Shirt. L.M. Aff. ¶ 18 [Doc. No. 43]; Tucker Aff. ¶ 8 [Doc. No. 46]. L.M's father picked L.M. up from school and L.M. did not return to class for the rest of the day. Id. at ¶ 8. L.M. did not observe any disruption to school classes or activities by his wearing of the Shirt. L.M. Aff. ¶ 17 [Doc. No. 43]. Nor did L.M. observe any students complaining or appearing to be upset. Id. at ¶ 16.

L.M. returned to school the following day and has attended every school day since then. Tucker Aff. ¶ 10 [Doc. No. 46]. L.M. was permitted to wear other t-shirts to Nichols, including ones with the messages: "Don't Tread on Me"; "First Amendment Rights"; "Freedom Over Fear"; and "Let's Go Brandon." Tucker Aff. ¶¶ 11, 28 [Doc. No. 46]. L.M. was not asked to remove any of these shirts. Id.

---

[1] L.M. attests that he equates "gender" with "sex" and that he believes that there are only two sexes, male and female. Id. at ¶ 6.

On April 1, 2023, L.M.'s father emailed Superintendent Lyons regarding the March 21, 2023 incident. Verified Compl. ¶ 95 [Doc. No. 11]; Lyons Aff. ¶ 4 [Doc. No. 45]. L.M.'s father asked about the substance and number of complaints lodged regarding the Shirt and why L.M. was removed from class given the Shirt "simply stated [L.M.]'s view on a subject that has become a political hot topic." Compl, Ex. E Emails [Doc. No. 11-7]. On April 4, 2023, Lyons responded that L.M. was not, nor would be the subject of discipline for wearing the Shirt. Id. Lyons explained that Tucker sought L.M.'s compliance with the Dress Code, which Lyons supported, where the "content of [the S]hirt targeted students of a protected class; namely in the area of gender identity." Id.

L.M. has not been restricted from posting on social media when not in school. Tucker Aff. ¶ 12 [Doc. No. 46]. On April 13, 2023, L.M. attended the School Committee meeting and spoke during the public comment period regarding the Shirt. Verified Compl. ¶ 97 [Doc. No. 11]. At the School Committee Meeting, L.M. stated:

> What did my shirt say? Five simple words: "There are only two genders." Nothing harmful. Nothing threatening. Just a statement I believe to be a fact. I have been told that my shirt was targeting a protected class. Who is this protected class? Are their feelings more important than my rights? I don't complain when I see "pride flags" and "diversity posters" hung throughout the school. Do you know why? Because others have a right to their beliefs just as I do. Not one person, staff, or student told me that they were bothered by what I was wearing. Actually, just the opposite. Several kids told me that they supported my actions and that they wanted one too.

Id. L.M.'s statements have been broadcast on YouTube. Id. (citing *There Are Only Two Genders*, YouTube, (May 3, 2023) bit.ly/3pD6TN8 (last accessed May 16, 2023) at 9:40-12:20).

On April 27, 2023, counsel for L.M. sent a letter to Lyons, asserting that Defendants had censored L.M. in violation of his First Amendment rights by restricting L.M. from wearing the Shirt in school. Id. at ¶¶ 98, 99; Verified Compl. Ex. F, April 27, 2023 Letter [Doc. No. 11-8]. The letter stated that L.M. intended to wear the Shirt again on May 5, 2023. Counsel requested

Lyons' confirmation that L.M. would be permitted to wear the Shirt. Verified Compl. ¶¶ 98-99 [Doc. No. 11]; Verified Compl. Ex. F, April 27, 2023 Letter [Doc. No. 11-8].

On or about April 29, 2023, the incident involving the Shirt became the subject of news coverage, which included interviews of L.M. and discussion on social media amongst parents, students, and others about the incident. Tucker Aff. ¶ 16 [Doc. No. 46].

On May 4, 2023, counsel for the Middleborough Public Schools responded to L.M.'s counsel's letter, stating that under Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 508 (1969), and Massachusetts law prohibiting discrimination, harassment, and bullying on the basis of sexual orientation and gender identity, Middleborough Public Schools "has, and will continue to, prohibit [the Shirt worn by L.M.] or anyone else [wearing messages] likely to be considered discriminatory, harassing and/or bullying to others including those who are gender nonconforming by suggesting that their sexual orientation, gender identity or expression does not exist or is invalid." Verified Compl. Ex. G, May 4, 2023 Letter [Doc. No. 11-9]. Assistant Principal Jason Carroll learned of this letter from Principal Tucker and was aware of concern that the Shirt "would be disruptive and would cause students in the LGBTQ+ community to feel unsafe." Affidavit of Jason Carroll ("Carroll Aff.") ¶ 3 [Doc. No. 47].

On May 5, 2023, L.M. wore the Shirt to Nichols, but with the phrase "ONLY TWO" covered by a piece of tape with the word "CENSORED" (the "Taped Shirt"). L.M. Aff. ¶¶ 19, 20 [Doc. No. 43]. When L.M. arrived at his first class, he was instructed to go to Tucker's office. Id. at ¶ 20; Carroll Aff. ¶ 4 [Doc. No. 47] (Carroll looked for L.M. that morning and brought him to Carroll's office to meet with Tucker and Carroll). Before meeting with Tucker, L.M. removed the Taped Shirt. L.M. Aff. ¶ 20 [Doc. No. 43] (L.M. removed the Taped Shirt on the way to the

office); Carroll Aff. ¶ 4 [Doc. No. 47] (when Carroll and Tucker entered Carroll's office, L.M. had already removed the Taped Shirt); Tucker Aff. ¶ 22 [Doc. No. 46] (when Tucker returned to Carroll's office after speaking with the Superintendent and School counsel, L.M. had removed the Taped Shirt). Tucker instructed L.M. that he could keep the Taped Shirt in his backpack or leave it in the Assistant Principal's Office for the day. Tucker Aff. ¶ 22 [Doc. No. 46]. L.M. put the Taped Shirt away and returned to class. L.M. Aff. ¶ 21 [Doc. No. 43]; Carroll Aff. ¶ 5 [Doc. No. 47]. He did not wear the Taped Shirt for the remainder of the school day. L.M. Aff. ¶ 21 [Doc. No. 43]. L.M. did not witness any disruption to school classes or activities resulting from his wearing the Taped Shirt on May 5, 2023. L.M. Aff. ¶ 22 [Doc. No. 43].

On May 9, 2023, two other students wore shirts with the words "There Are Only Two Genders" to Nichols. Tucker Aff. ¶ 24 [Doc. No. 46]. Tucker met with the students and told them they were required to change their shirts. Id. One student followed this directive and returned to class. Id. The other student did not, the student's parents were called, and Tucker met with the student's mother at the school. Id. Following this meeting, the student went home as the school day was over. Id. Neither these two students nor L.M. was disciplined after wearing a shirt with the words "There are only two genders." Id. at ¶¶ 9, 24.

On May 11, 2023, Plaintiff filed the instant action bringing claims under 42 U.S.C. 1983 for violation of the First and Fourteenth Amendments. L.M. contends that the Defendants' application of the Dress Code to restrict the Shirt and the Taped Shirt, but not other messages by Nichols students pertaining to sexual orientation, gender identity, and expression, amounted to impermissible viewpoint discrimination. Plaintiff also asserts that the Dress Code is vague and overbroad on its face.

On May 19, 2023, Plaintiff filed his <u>Emergency Motion for a Temporary Restraining Order and Preliminary Injunction</u> [Doc. No. 12]. Following a hearing, the court denied emergency relief. June 1, 2023 Elec. Order [Doc. No. 38]. The court held oral argument as to the preliminary injunction on June 13, 2023. Clerk's Notes [Doc. No. 48].

## II.  Preliminary Injunction Standard

The issuance of a preliminary injunction before a trial on the merits can be held is an "extraordinary remedy" that shall enter only if a plaintiff makes a clear showing of entitlement to such relief. <u>Winter v. Nat. Res. Def. Council, Inc.</u>, 555 U.S. 7, 22 (2008). In evaluating a motion for a preliminary injunction, the court considers four factors:

> (1) the likelihood of success on the merits; (2) the potential for irreparable harm [to the movant] if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest.

<u>Esso Standard Oil Co. v. Monroig–Zayas</u>, 445 F.3d 13, 17–18 (1st Cir. 2006) (quoting <u>Bl(a)ck Tea Soc'y v. City of Boston</u>, 378 F.3d 8, 11 (1st Cir. 2004)).

The first factor is the most important: if the moving party cannot demonstrate a likelihood of success on the merits, "the remaining factors become matters of idle curiosity." <u>New Comm Wireless Servs., Inc. v. SprintCom, Inc.</u>, 287 F.3d 1, 9 (1st Cir. 2002). "In the First Amendment context, the likelihood of success on the merits is the linchpin of the preliminary injunction analysis." <u>Sindicato Puertorriqueno de Trabajadores v. Fortuno</u>, 699 F.3d 1, 10 (1st Cir. 2012). "To demonstrate likelihood of success on the merits, plaintiffs must show 'more than mere possibility' of success—rather, they must establish a 'strong likelihood' that they will ultimately prevail." <u>Id.</u> at 9 (quoting <u>Respect Maine PAC v. McKee</u>, 622 F.3d 13, 15 (1st Cir. 2010)).

### III.    Discussion

A.    *Likelihood of Success on the Merits*

1.    Legal Framework

A student's rights to freedom of expression while attending public school in Massachusetts is defined by Supreme Court and First Circuit case law. "First Amendment rights, applied in light of the special characteristics of the school environment, are available to teachers and students." <u>Tinker</u>, 393 U.S. at 506. "[F]or the State in the person of school officials to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." <u>Id.</u> at 509.

But "the First Amendment rights of students in public schools are not automatically coextensive with the rights of adults in other settings, and must be applied in light of the special characteristics of the school environment." <u>Hazelwood Sch. Dist. v. Kuhlmeier</u>, 484 U.S. 260, 266 (1988) (internal citation and quotation marks omitted). "A school need not tolerate student speech that is inconsistent with its basic educational mission, [ ] even though the government could not censor similar speech outside the school." <u>Id.</u> (citation and internal quotation marks omitted).

So while students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," schools may impose limitations on speech. <u>Tinker</u>, 393 U.S. at 506. "[C]onduct by the student, in class or out of it, which for any reason–whether it stems from time, place, or type of behavior–materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech." <u>Id.</u> at 513. This interest in regulating speech is at its strongest

when the speech occurs under the school's supervision, where the school stands <u>in loco parentis</u> towards all students, and of lesser interest where the speech or expression occurs outside of school. <u>Mahonoy Area Sch. Dist. v. B.L.</u>, 141 S.Ct. 2038, 2046 (2021).[2]

While a school bears the burden of justifying restrictions on student speech, <u>Norris on behalf of A.M. v. Cape Elizabeth Sch. Dist.</u>, 969 F.3d 12, 25 (1st Cir. 2020), courts should generally defer to school administrators' decisions regarding student speech so long as the administrators' judgment is reasonable, <u>id.</u> at 30.

     2.     Challenge to March 21, 2023 Dress Code Enforcement

Plaintiff contends that he is likely to prevail on his claim that the Shirt was constitutionally protected expression and that Defendants' enforcement of the Dress Code on March 21, 2023, impermissibly restricted L.M.'s First Amendment free speech right, constituted viewpoint discrimination, and lacked justification. Plaintiff asserts that Defendants have not met their burden of demonstrating (i) that the shirt caused a material and substantial disruption, where Defendants assert only a few unidentified complaints were made, or (ii) that the Shirt invaded the rights of others, where the Shirt did not target a specific individual. Mem. in Supp. of Pl. Emergency Mot. for Temp. Restraining Order and Prelim. Injunction ("PI Mem.") 9-10 [Doc. No. 13]; Pl. Suppl. Mem. in Supp. of Mot. for Prelim. Injunction ("Suppl. PI Mem.") 7 [Doc. No. 42]. Defendants do not dispute that the Shirt may be constitutionally protected speech,

---

[2] The Court in <u>Mahonoy</u> pointed to three features of off-campus speech that diminish the strength of the unique educational characteristics that call for special First Amendment leeway in school: (1) the school is rarely standing <u>in loco parentis</u> off campus; (2) regulation of off-campus speech coupled with regulations on-campus speech would stop students from engaging in speech at all; and (3) "the school itself has an interest in protecting a student's unpopular expression, especially when the expression takes place off campus" because of schools' role in preparing citizens to carry on "[o]ur representative democracy." 141 S.Ct. at 2046.

however, they assert that their restriction of the Shirt was justified where (i) the administration received complaints from students and staff, and (ii) the Shirt invaded on the rights of trans and gender non-conforming students, who are a protected class under Massachusetts law. Defs. Opp. 5, 10 [Doc. No. 44].

Plaintiff has not established a likelihood of success on the merits where he is unable to counter Defendants' showing that enforcement of the Dress Code was undertaken to protect the invasion of the rights of other students to a safe and secure educational environment. School administrators were well within their discretion to conclude that the statement "THERE ARE ONLY TWO GENDERS" may communicate that only two gender identities–male and female– are valid, and any others are invalid or nonexistent,[3] and to conclude that students who identify differently, whether they do so openly or not, have a right to attend school without being confronted by messages attacking their identities. As Tinker explained, schools can prohibit speech that is in "collision with the rights of others to be secure and be let alone."  393 U.S. at 508.

Plaintiff contends that, under Norris, Defendants could not restrict the Shirt as an "invasion of the rights of others" unless it determined that the speech "targeted a *specific* student." Suppl. PI Mem. 7, 8 [Doc. No. 42] (quoting Norris, 969 F.3d at 29, emphasis added by Plaintiff). Norris, however, did not attempt to set a rule for all speech that is an "invasion[] of the rights of others" or even "the precise boundaries of what speech constitutes 'bullying' such that it falls within the 'invasion of the rights of others' framework of Tinker." Norris, 969 F.3d at 29

---

[3] L.M. attests that he does not believe his views about sex and gender to be inherently hateful and does not intend to deny any individual's existence. L.M. Aff. ¶¶ 8-9 [43]. His intent is not relevant to the question of whether the school permissibly concluded that the Shirt invades the rights of others.

n.18. Instead, <u>Norris</u> concluded that where the school had justified the limitation on the student's statement that "THERE IS A RAPIST IN OUR SCHOOL AND YOU KNOW WHO IT IS" on the ground that the student had engaged in "bullying" under the school's policy, the school was required to demonstrate that it had a reasonable basis to determine that the speech targeted a specific student and invaded that student's rights. <u>Id.</u> at 25, 29.

 Here, the School's rational for prohibiting the Shirt is not that LM is bullying a specific student, but that a group of potentially vulnerable students will not feel safe. A broader view directed at students' safety has been acknowledged by other courts. <u>See</u>, <u>e.g.</u>, <u>West v. Derby Unified Sch. Dist. No. 260</u>, 206 F.3d 1358, 1366 (10th Cir. 2000) (holding the display of the confederate flag may interfere with the rights of others to be secure); <u>Chandler v. McMinnville Sch. Dist.</u>, 978 F.2d 524, 529 (9th Cir. 1992) (recognizing that school officials may suppress speech that is vulgar, lewd, obscene, or plainly offensive as "such language, by definition, may well 'impinge upon the rights of other[s].'"); <u>Scott v. School Bd. of Alchua Cty.</u>, 324 F.3d 1246. 1247 (11th Cir. 2003) (recognizing that a students' rights cannot interfere "with a school administrator's professional observation that certain expressions have led to, and therefore could lead to, an unhealthy and potentially unsafe learning environment for the children they serve."); <u>see</u> <u>also</u> <u>Doe v. Hopkinton Pub. Schs.</u>, 19 F.4th 493, 505 (1st Cir. 2021) ("<u>Tinker</u> holds that schools have a special interest in regulating speech that involves the 'invasion of the rights of others.'").

Accordingly, Plaintiff has not shown a substantial likelihood of success on his claim that Defendants violated his constitutional rights in requiring him to remove the Shirt at school.[4]

3.    Challenge to May 5, 2023 Dress Code Enforcement

Plaintiff contends that he is likely to prevail on his claim that Defendants also unconstitutionally restricted his speech when Plaintiff wore the Taped Shirt to school on May 5, 2023, because (i) the underlying message was constitutionally protected speech, and (ii) the Taped Shirt was a form of constitutionally protected protest of Defendants' censorship of Plaintiff. Suppl. PI Mem. 3-4 [Doc. No. 42]. Defendants respond that the underlying message was not constitutionally protected speech, and that Plaintiff's use of tape on the Shirt merely covered part of the offending message while still conveying the same meaning and raising the same concerns for which Defendants had restricted the Shirt in the first place.[5] Defs. Opp. 7-8 [Doc. No. 44].

Plaintiff again is unable to demonstrate a reasonable likelihood of success on the merits where Defendants have shown that they restricted the speech based on their expectation that it too would intrude on the rights of others. First, as discussed supra, the original message of the Shirt was not protected speech and could be restricted by Defendants. Second, while a message protesting censorship would not invade the rights of others, the school administrators could

---

[4] The court need not determine at this juncture whether Defendants were also justified in prohibiting the Shirt under Tinker based on a material disruption of classwork or substantial disorder.

[5] Defendants also assert that the Taped Shirt could be restricted because Defendants had reasonably forecast substantial and material disruption stemming from the taped version of the Shirt. Defendants rely, in part, on threats received by school staff and administrators about the Shirt and its restriction, as well as the need for an increased police presence at Nichols. Lyons Aff. ¶¶ 10-11 [Doc. No. 45]. These threats should be discouraged by all parties. The court has not considered those threats in applying the "invasion of the rights of others" prong of Tinker.

13

reasonably conclude that the Taped Shirt did not merely protest censorship but conveyed the "censored" message and thus invaded the rights of the other students.

> 4.      Challenge to the Dress Code

Plaintiff contends that he is also likely to show the Dress Code is facially vague and overly discretionary where it targets some speech and not others. PI Mem. 14 [Doc. No. 13]. Plaintiff points to the Dress Code's application to L.M.'s "protest" on May 5, 2023, as an illustration of how "vague" and "overbroad" the Dress Code is on its face. Suppl. PI Mem. 14 [Doc. No. 42]. But this example does not support his claim where Defendants could reasonably find that the Taped Shirt would interfere with the rights of other students.

Nor is Plaintiff's overbreadth challenge likely to succeed where the Dress Code does not threaten discipline for a violation of the Dress Code that has not been specifically identified by the school as improper. To the contrary, the Dress Code provides that "[i]f students wear something inappropriate to school, they will be asked to call their parent/guardian to request that more appropriate attire be brought to school." Verified Compl., Ex. C 44-45 [Doc. No. 11-5]. Only "[r]epeated violations of the [D]ress [C]ode will result in disciplinary action." Id. at 45.

Accordingly, L.M. has failed to demonstrate a likelihood of success on the merits of his claim that the Dress Code facially violates his First Amendment rights.

> B.      *Potential for Irreparable Harm*

L.M. has likewise not established a potential for irreparable harm absent a preliminary injunction. L.M. contends that any deprivation of his First Amendment freedoms constitutes irreparable injury, and that, where he has made a strong showing of a likelihood of success on the merits, "the irreparable injury component of the preliminary injunction analysis is satisfied as well." PI Mem. 14-15 [Doc. No. 13]. However, where the court has concluded that Plaintiff has

not demonstrated a likelihood of success on the merits, and Plaintiff offers no other arguments as to the potential for irreparable harm, Plaintiff has failed to establish this prong of the preliminary injunction analysis.

      C.    *Balance of Equities*

The third prong of the preliminary injunction analysis, the balance of equities between the parties, cuts in Defendants' favor. As to the harm to L.M. absent an injunction, there is no doubt Defendants have restricted L.M.'s speech during school hours. However, this is not a circumstance where the restrictions are such that L.M. "cannot engage in that kind of speech at all." Mahonoy Area Sch. Dist., 141 S.Ct. at 2046. Although L.M.'s speech as to the specific message displayed on the Shirt has been restricted while at school, L.M. has been and remains free to convey his message elsewhere, and in fact, his message has been amplified through social media, news outlets, and this litigation. Further, L.M. has not been restricted from other speech while attending school. He has worn a variety of messages, see Tucker Aff. ¶ 11 [Doc. No. 46], and can voice his views elsewhere, id. at ¶ 12; Verified Compl. ¶ 97 [Doc. No. 11]. L.M. has only been prohibited from wearing the Shirt and the Taped Shirt, and only while attending school, based on Defendants' reasonable determination that the Shirt invaded the rights of other students.

Defendants, by contrast, contend that, were an injunction to issue, the hardship to Defendants and students at Nichols would not be insignificant. First, Defendants contend that the Shirt would cause harm to students who identify as transgender or gender nonconforming because it would prevent them from attending school without harassment. See Defs. Opp. 17-19 [Doc. No. 44]. Second, Defendants contend that, were Plaintiff permitted to wear the Shirt, Defendants would fail to comply with their mandate from the Massachusetts Legislature

prohibiting discrimination, bullying, or harassment in schools based on gender identity or expression and directives from the Massachusetts Department of Elementary and Secondary Education ("DESE") requiring that schools provide a safe environment to progress academically and developmentally regardless of gender identity. Id.; see also M.G.L. c. 76 § 5; M.G.L. c. 71 § 37O; 603 C.M.R. § 26.05; DESE, Guidance for Mass. Pub. Sch. Creating a Safe and Supportive School Environment, available at https://www.doe.mass.edu/sfs/lgbtq/genderidentity.html.

The balance of relative hardships cuts against the requested relief. While Plaintiff may experience some limited restriction in his ability to convey a specific message during the school day absent injunctive relief, were an injunction to issue, the court credits Defendants' contention that other students' rights to be "secure and to be let alone" during the school day would be infringed upon, as would Defendants' ability to enforce policies required under state law and regulations. Accordingly, this prong weighs against Plaintiff's requested relief.

D.    *Public Interest*

Finally, the court must consider the preliminary injunction's effect on the public interest. Plaintiff asserts that enjoining unconstitutional acts is always in the public interest. PI Mem. 15 [Doc. No. 13] (quoting Dorce v. Wolf, 506 F. Supp. 3d 142, 145 (D. Mass. 2020)). However, as discussed supra, Plaintiff has not established a likelihood of success on his claim that an unconstitutional act occurred or is threatened, and therefore, has not established an injunction is in the public interest. By contrast, Defendants point to statutes passed by the Massachusetts Legislature prohibiting discrimination, bullying, or harassment in schools based on gender identity or expression, as well as directives from the Massachusetts Department of Elementary and Secondary Education requiring that schools provide a safe environment to progress academically and developmentally regardless of gender identity. Defs. Opp. 7-8 [Doc. No. 44].

Accordingly, this prong weighs against injunctive relief as well.

**IV.     Conclusion**

For the foregoing reasons, all four preliminary injunction factors weigh against the relief requested, and accordingly, Plaintiff's <u>Motion for Preliminary Injunction</u> [Doc. No. 12] is DENIED.

IT IS SO ORDERED

June 16, 2023                                              /s/  Indira Talwani
                                                          United States District Judge